**John C. CASEY, Appellee,**

**v.**

**CITY OF CABOOL, MISSOURI, Jay Gentry, Individually and in the official capacity as Alderperson of the City of Cabool, Missouri; Jerry D. Roberts, Individually and in the official capacity as Alderperson of the City of Cabool, Missouri, Appellants.**

**No. 93–1262.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 15, 1993.

Decided Dec. 28, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied April 5, 1994.*

---

* Bowman, Loken and Hansen, Circuit Judges, would grant the suggestion for rehearing en banc.

Timothy E. Gammon, Springfield, MO, argued, for appellants.

Frank Susman, St. Louis, MO, argued, for appellee.

Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The City of Cabool, Missouri ("the City") and two city council members appeal a district court judgment and award of attorney's fees in favor of John C. Casey, a former employee who brought this action under 42 U.S.C. § 1983 after he was discharged. At issue is whether a municipal government may be held liable for discharging an employee for making private statements critical of city officials and policies. We hold that it may and therefore affirm.

I.

John Casey was employed by the City as a police and fire dispatcher beginning in 1981. He also held the position of fire chief for the City before resigning from that post in September of 1983. The reason for his resignation at that time, and the apparent catalyst for the present dispute, was Casey's deeply held and frequently expressed opinions on City fire department policies.

On May 3, 1990, Casey went to the office of City Administrator Michael MacPherson prior to beginning his work shift. While in MacPherson's office, Casey expressed his disapproval of certain fire department policies. When the work whistle blew at 5 o'clock, Casey reported to work at the police department across the street. A few minutes later MacPherson followed, and the conversation regarding fire department policies continued in Casey's office. At that point Casey suggested that the Missouri state auditor might be contacted about these issues, and that such scrutiny might mean trouble for the city clerk and the mayor. Casey elaborated by asserting that the clerk had employed city resources to effect repairs at her home, and that when he informed the mayor he was told that the clerk was retiring soon. Casey then told MacPherson that when the mayor was reelected he reappointed the clerk, evidently suggesting that the mayor had done something he previously indicated he would not do. Casey also apparently alleged that the clerk's son had once shown up intoxicated for duty as a volunteer fire fighter. The city produced evidence that

Lynn Jones, Casey's supervisor, walked in and overheard some of the conversation.

MacPherson related the conversation to the mayor and the city clerk, and a few days later, to an executive session of the city council. MacPherson stated that Casey had no right to question city council policy, and that to do so was unacceptable, insubordinate, and disloyal. As a result, the council voted two to one to terminate Casey's employment with the City.

Casey brought this action under 42 U.S.C. § 1983, alleging that he had been discharged from public employment in violation of his right to free speech. The district court entered judgment upon a jury verdict of $18,888, and awarded plaintiff attorney's fees of $65,987 and expenses of $3,294.89. The City now appeals both the judgment and the fee award.

## II.

It was once the law that:

[w]ords spoken in derogation of a ... great officer of the realm, which are called *scandalum magnatum,* are held to be ... heinous; and, ... when spoken in disgrace of such high and respectable characters, they amount to an atrocious injury: which is redressed ... on behalf of the crown, to inflict the punishment of imprisonment on the slanderer....

3 William Blackstone, Commentaries on the Laws of England 123–124 (1768). A revolution intervened, however, so that today "[i]t is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). This does not imply that public employees are free to say anything they wish. Only constitutionally protected speech serves as an impermissible basis for discharge of a public employee.

■ Even where constitutionally protected speech is involved, public employees are not free simply to speak their minds. The determination of whether a discharge for free speech was proper requires "a balance be-

tween the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The question of whether Casey's discharge was permissible, then, requires (1) an inquiry into whether his speech is constitutionally protected, and (2) a balancing of his interest in free speech against the City's interest in efficient administration.

### A.

■ The threshold question is therefore whether Casey's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–148, 103 S.Ct. at 1690. Because Casey's speech amounted to straightforward criticism of government officials and policy, we hold that it falls squarely within the meaning of "speech on a matter of public concern."

■ Criticism, no matter how obnoxious or offensive, of government officials and their policies clearly addresses matters of public concern. *See Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). In *Rankin,* a clerical worker in a law enforcement agency was held to have spoken on a matter of public concern when, after hearing of an attempt on the life of the president, she said, "If they go for him again, I hope they get him." *Id.* at 380, 107 S.Ct. at 2844. The court reasoned that the statement, made within the context of criticism of the president's policies, was clearly an expression of displeasure with those policies.

Similarly, when Casey's statements are considered in context, as *Connick* requires, it becomes apparent that they dealt with matters of public concern. They were made in the context of a discussion of City policy and

the actions of City officials. Few topics are of greater public concern.

The City argues that, since Casey's underlying concern was the effect that City fire policy would have on his own pocketbook, his statements were really of private, and not public, concern. This reasoning is unpersuasive. A taxpayer's concerns that a City policy might raise his insurance premiums is a concern about a public policy, the effects of which are ultimately always private.

While MacPherson, the mayor, the city clerk, and the majority of the Cabool city council may have taken great offense upon hearing Casey's statements, we emphasize that offensiveness is irrelevant to the issue of whether a matter is of public concern. *See Rankin*, 483 U.S. at 387, 107 S.Ct. at 2898–99. Nothing that Casey is alleged to have said could be more disturbing than an expressed desire by a law enforcement employee to see criminal violence inflicted on the president. Since in the present context, the content, and not the outrageousness of the statement, is the material matter, we find that Casey's speech was on a matter of public concern.

### B.

■ Our analysis next requires a balancing of Casey's interest in making the statement against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. Even if Casey's statements were on a matter of public concern, they may still serve as permissible grounds for discharge if the City can show that the statements interfere with a legitimate governmental interest in the operational efficiency of the enterprise. *See Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. "The State bears a burden of justifying the discharge on legitimate grounds." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899.

■ When balancing the free speech and administrative interests, "the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388, 107

S.Ct. at 2899. The effects on discipline, harmony among co-workers, working relationships requiring loyalty and confidence, the performance of the speaker's duties, or the regularity of the operation of the enterprise are all relevant considerations. *Id.*

■ We begin our review of the application of the *Pickering* principles to this case with the observation that any underlying factual disputes concerning whether the speech at issue was protected should have been submitted to the jury. See *Shands v. City of Kennett*, 993 F.2d 1337, 1342 (8th Cir.1993). The trial court did not do that, ruling, in effect, that there were no relevant factual disputes of a submissible character. Although defendants submitted instructions submitting some factual matters to the jury, those instructions were prolix, confused, and in part clearly inappropriate. The trial court thus properly rejected them, even if there were unresolved factual disputes that deserved submission.

In any case, we believe that the trial court acted properly in ruling on the question of whether the speech in question was protected. Casey's interest in making the statements was substantial. Indeed, a citizen's right to be critical of government and government officials lies at the core of the principle of free speech. We also observe that the only legitimate governmental interest in preventing or punishing employee speech is to promote or maintain "the effective functioning of the public employer's enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. It is not permissible to use the power of government office for the private purpose of protecting those who hold government office.

Second, the City's interest in effective, efficient Government was unaffected by Casey's statements. Casey's speech had no impact on his ability to perform his duties as a dispatcher. Although a portion of the conversation is alleged to have been overheard, no working relationships were placed in jeopardy, since Casey did not work in close contact with anyone discussed. No effect could be had on the operations or effectiveness of City government, unless the City operated in a way that might not survive scrutiny. Finally, nothing in the statements made ren-

ders Casey unsuitable for state employment. There was no disclosure of dishonesty or illegality on Casey's part. In sum, it is difficult to see how Casey's discharge furthered any legitimate interest at all.

The City, relying on *Smith v. Cleburne County Hospital,* 870 F.2d 1375 (8th Cir. 1989), argues that the district court erred in failing to distinguish certain of Casey's various statements as unprotected speech for which the discharge might have been proper. In *Cleburne County Hospital,* a hospital denied staff privileges to a doctor after he engaged in a protracted public debate with administrators over hospital policies. This court determined that, while much of the doctor's initial speech was protected, the "caustic personal attacks" on hospital administrators made in subsequent letters to patients were not on a matter of public concern. *Id.* at 1382.

The City's reliance on *Cleburne County Hospital* is misplaced. That case was simply an application of the *Pickering* balancing analysis, not an exception to it. The doctor in that case was denied staff privileges, not because of personal attacks on administrators, but because his expressive activity caused "disruption, disharmony, dissention, and create[d] an adverse economic effect on the public service the institution performs." 870 F.2d at 1383. Through these adverse effects, the hospital in *Cleburne* was able to demonstrate a legitimate basis for the denial of staff privileges. In short, the "interest of the State, as an employer, in promoting the efficiency of the public services it performs" outweighed the doctor's interest as a citizen in free speech. *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. In the present case, the City failed to demonstrate that Casey's statements had any effect whatsoever on the efficiency or effectiveness of City government.

### III.

■ Defendant city council members Gentry and Roberts assert that they were entitled to qualified immunity from suit in this case. It is true that officials engaged in executive functions, such as the termination decision in this case, have sometimes successfully advanced a qualified immunity defense. *See, e.g., Hafer v. Melo,* —— U.S. ——, ——, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991).

This immunity, however, is available only if defendant's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). No right is more clearly established in our republic than freedom of speech. It is also "clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin,* 483 U.S. at 383, 107 S.Ct. at 2896. Since the rights infringed in this case were clearly established, the judgment of the district court with respect to defendants Gentry and Roberts was proper.

### IV.

We turn next to the issue of the award of attorney's fees. Fee shifting in § 1983 cases is governed by statute. The relevant portion of 42 U.S.C. § 1988 reads:

> In any action or proceeding to enforce a provision of section[ ] ... 1983, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

### A.

■ The initial question regarding the propriety of awarding attorney's fees in a civil rights case is whether the party requesting fees can be characterized as a prevailing party. A prevailing party is one that obtains "at least some relief on the merits of his claim." *Farrar v. Hobby,* 506 U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). Any relief, even nominal damages, satisfies the requirement for prevailing party status. *Id.* "[T]he prevailing party inquiry does not turn on the magnitude of the relief obtained." By this standard, the damage award of $18,888 clearly makes Casey a prevailing party under the statute.

### B.

■ We turn now to the amount of the fee award. "The district court's determination respecting fees is reversible only if the court abused its discretion." *Hendrickson v. Branstad,* 934 F.2d 158, 162 (8th Cir.1991).

"The lodestar award (the product of reasonable hours multiplied by a reasonable rate) is presumptively a reasonable fee, and most factors relevant to determining the amount of a fee are subsumed within the loadstar." *Id.* Accordingly, if the district court awarded the loadstar amount, peculiarities must be present to overcome the presumption that the district court did not abuse its discretion.

To evaluate fairly the district court's exercise of discretion in this case, it is necessary to review the purpose of the statutory provision applied. Congress intended that "[i]n computing the fee, counsel for prevailing parties should be paid, as is traditional for attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.'" S.Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913. The primary purpose of this formulation is to promote diffuse private enforcement of civil rights law by allowing the citizenry to monitor rights violations at their source, while imposing the costs of rights violations on the violators. *See* Id. A plaintiff bringing a civil rights action "does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest...." *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).

In order for such a policy to be effective, Congress felt it appropriate to shift the true full cost of enforcement to the guilty parties to eliminate any obstacle to enforcement. "It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases...." S.Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913.

Fee awards must be structured so that attorneys of quality and experience with other profitable demands upon their time will not need to sacrifice income available in alternative enterprises in order to effect a public policy intended to protect all citizens.

In other words, "the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff." *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1149 (7th Cir.1993) (quoting *Barrow v. Falck,* 977 F.2d 1100, 1105 (7th Cir.1992)). Any other rule would relegate civil rights enforcement (and the law that results) to those lawyers with below-market billing rates. The rates for these lawyers are usually below market for a reason. A refusal to pay for experience and expertise will exact a cost in the form of inexperience and, perhaps, incompetence.

While the opportunity cost of the lawyer's time provides the starting point for determining a presumptively correct hourly rate, it is not the end of the inquiry. Other considerations, including the complexity of the litigation and the relevant market for legal services from which the plaintiff had to choose are also of relevance. The City does not claim that the issues in this case were so simple that the most junior of attorneys could have handled it. The City could not continue to contend that they have no liability here at all, with one breath, and then assert that this case was a "pushover" for plaintiff with the next.

Another consideration in determining the reasonableness of the fee is the relevant market involved. The relevant market for attorneys in a matter such as this may extend beyond the local geographic community. "A national market or a market for a particular legal specialization may provide the appropriate market." *Hendrickson v. Branstad,* 740 F.Supp. 636, 642 (N.D.Iowa 1990) (reversed in part on grounds not relevant here, *Hendrickson v. Branstad,* 934 F.2d 158 (8th Cir. 1991)). To limit rates to those prevailing in a local community might have the effect of limiting civil rights enforcement to those communities where the rates are sufficient to attract experienced counsel. Civil rights would be more meaningful, then, in those communities (large cities) where experienced attorneys can command their customary fees. This result would be in direct contravention of the purpose of diffuse enforcement through the "private attorneys general" concept.

## C.

With these considerations in mind, we look now to the award of fees in this case. The district court awarded the lodestar in this case, and in fact reduced it to account for some of the considerations mentioned above. The court found $150.00 per hour and $120.00 per hour for the two plaintiff's attorneys, respectively, to be a reasonable rate for their services in this case, and allocated significantly smaller amounts for the work of their staff. These rates were chosen despite the fact that Mr. Susman, the lead attorney in this case, requested a rate equivalent to his customary billing rate of $185.00 per hour.

The City contends that some of the time compensated was spent in pursuit of theories and on issues upon which Casey did not prevail. This argument ignores the precedents on this issue and their rationale. Once a party is found to have prevailed, "[a] fee award should not be reduced merely because a party did not prevail on every theory raised in the lawsuit." *Hendrickson*, 934 F.2d at 164. In *Hendrickson*, this court found that a fee awarded under § 1988 properly compensated plaintiff's attorney for time spent on interrelated issues and theories upon which the plaintiff did not prevail. *Id.* We reasoned that counsel's time is devoted to the case as a whole, rather than to specific theories. The dispositive consideration therefore, is whether the issues upon which plaintiff's counsel spent time are interrelated to the central issues of the case. The defendants, however, point to five issues upon which the plaintiff did not prevail, without addressing whether these or other issues might be unrelated to the central issues of the case. Since defendants did not raise the issue of interrelatedness below, and do not raise it here, we are precluded from addressing that question.

We find that the reasons given by the district court support the fees assessed, and find no basis upon which to find that the court abused its discretion. It is the defendants' burden to show that this discretion was abused, and in this effort they have failed. The district court's award of attorney's fees is consistent with the policy that Congress articulated when it enacted the fee shifting provision of § 1988, and, therefore, is affirmed.

## V.

We conclude that the City violated Casey's right to free speech. Since this right is protected from government actions like those at issue here, the defendants are liable for the misuse of public authority. The judgment of the district court is affirmed.