**Thomas SPIERING, Plaintiff,**

v.

**CITY OF MADISON, South Dakota; Joan Krantz, Mayor; Marvin Hanson, Joanne Gagnon, George Lee, and Robert Hall, City Commissioners; and Gary Gile, Chief of Police, Defendants.**

No. Civ. 92–4078.

United States District Court,
D. South Dakota,
Southern Division.

Aug. 1, 1994.

Rita D. Haverly–Allen, Hagen, Wilka and Archer, P.C., Sioux Falls, SD, Stephen Lane Pevar, ACLU, Denver, CO, for plaintiff.

Gary P. Thimsen, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for defendants.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Plaintiff Thomas Spiering brings this 42 U.S.C. § 1983 action claiming that defendants violated his First Amendment rights when they demoted him from the position of police captain. The Court took the case under advisement following a bench trial that concluded on Wednesday, July 20, 1994.

## I. Findings of Fact

Plaintiff is now sixty years old. He finished eighth grade and went to work on the family farm. He completed a GED certificate in 1966, but he has no other formal education. He has been married forty years and has two grown children and four grandchildren. Plaintiff was honorably discharged from the military and has been a law enforcement officer since 1964, except for a five-year period.

Plaintiff has been employed at the Madison Police Department since 1982. He was promoted to the rank of sergeant in 1988, he served as acting Chief of Police for a time during 1988, and he was promoted to the rank of captain in October 1988 on the recommendation of former Police Commissioner Marvin O. Hanson. Commissioner Hanson served as an elected official; he has an eighth grade education and no law enforcement training or experience. At the time of plaintiff's promotion to captain, plaintiff and Robert Broderick were the only two police captains employed by the Madison Police Department. Prior to the events which gave rise to this lawsuit, Commissioner Hanson reprimanded plaintiff for failure to exercise proper supervisory judgment; however, Commissioner Hanson withdrew the reprimand from plaintiff's personnel file in August 1989. (Def.Ex. B.)

On Saturday night, May 20, 1989, at approximately 10:30 p.m., plaintiff and patrolman Robert Haug were on duty in a patrol car. Plaintiff saw Mark Harmon drive his car at a high rate of speed across a 7-Eleven convenience store parking lot located on a street corner. Plaintiff activated his patrol car lights, stopped Harmon's car, and asked Harmon for his driver's license. Harmon had three female passengers in the car. Off-duty Madison policeman Doug Flora appeared on the scene, left his private vehicle, approached Harmon's car, began cursing Harmon for "cutting him off," and jerked Harmon's driver's license from plaintiff's hand. Plaintiff moved Flora from the vicinity of the Harmon car, and Flora left. Plaintiff returned to the Harmon vehicle. By that time, Harmon had keyed the microphone on his CB radio, and he asked plaintiff to talk to Harmon's father over the CB radio. Harmon's father was in his motor home parked in the Spies parking lot. Plaintiff refused Mark Harmon's request, and issued Harmon a citation for avoiding a traffic sign or signal, a city ordinance violation. (Pl.Ex. 1.)

Just before this traffic stop, Harmon had pulled out abruptly in front of another car in which a Madison police officer and Madison Chief of Police Greg Gile were riding. These two officers drove to the vicinity of the Harmon stop and parked across the street. Chief Gile believes, and the Court finds, that plaintiff validly stopped Harmon. When plaintiff refused to speak to Harmon's father over the CB radio, Mark Harmon asked Chief Gile to do so. Chief Gile refused to discuss the matter over radio and told Harmon's father to contact him on Monday morning if he wished to discuss the matter. Chief Gile was unimpressed by the Harmons' demanding, belligerent attitudes, and he was not aware that the Harmons were passing through the city and planned to be elsewhere on Monday.

Late that same evening, Harmon's father called former Mayor Joan Krantz and Commissioner Hanson, both of whom were at their homes asleep, and he asked them to come to his motor home to discuss the incident involving his son. Both officials went to the motor home. The Harmons stated that they were from out-of-state and would be leaving Madison the next morning. They complained about the way Mark Harmon had been treated by Madison police and asked the officials to void the ticket.

█ Based upon the Harmons' complaints, Mayor Krantz and Commissioner Hanson felt the traffic stop had been improperly handled. Mayor Krantz and Commissioner Hanson did not contact Chief Gile or plaintiff to ask for their views of the traffic stop. Commissioner Hanson suggested that they void the ticket, and Mayor Krantz agreed they should. They retrieved the copy of the citation plaintiff had given to Mark Harmon, and they told the Harmons the ticket was rescinded and they would not have to return to South Dakota. Mayor Krantz believed that she had authority under S.D.C.L. § 9-

29–23 [1] to void tickets for city ordinance violations, but the Court finds the statute gave her no such authority. Mayor Krantz delegated the actual task of voiding the ticket to Commissioner Hanson, although she personally contacted each of the other commissioners and told them she and Commissioner Hanson had voided the ticket.

Following the Harmon traffic stop, plaintiff continued on patrol. When he passed the Spies parking lot, Harmon's father motioned for plaintiff to pull into the parking lot. As a result of their conversation, plaintiff believed that Commissioner Hanson had voided the ticket he had written to Mark Harmon.

The following day, Sunday, May 21, 1989, Commissioner Hanson called Chief Gile at home and told Gile that he and Mayor Krantz had decided to void the Harmon ticket. Although Chief Gile replied that he thought the ticket should be processed through the court system, he testified he did not respond as forcefully as he might now because at that time he had been Chief for only three weeks. Chief Gile was not given a choice about what to do regarding the ticket. Chief Gile then called plaintiff and complimented his handling of the Harmon incident, but he told plaintiff that the ticket would possibly be voided if such had not already occurred. At Commissioner Hanson's direction, Chief Gile did not file with the Clerk of Court the police copy of the Harmon citation, and Chief Gile placed it in his desk drawer until he threw it away during routine cleaning six months later.

Plaintiff checked on the status of the ticket within six months and could find no record in the police department or the Clerk of Court's office that the ticket had been processed. Plaintiff felt that voiding a ticket would send a message to the public that some citizens are above the law and this would undermine law enforcement. Police officers within the Madison Police Department and Madison citizens were concerned about the voiding of the Harmon ticket. Plaintiff had no knowledge of any other tickets that were rescinded by the Mayor or Police Commissioner, and the Court finds that the Harmon ticket was the only one ever voided in the City of Madison.

On December 11, 1989, Chief Gile disciplined plaintiff because of the way he handled a traffic stop of Earl Hutchinson. (Def.Ex. F.) Plaintiff, who was riding on patrol with a new patrolman, Officer Wollman, watched Hutchinson drive up over a curb, through a parking lot, and almost hit a telephone maintenance box. Plaintiff stopped Hutchinson a short distance from his home, but, instead of arresting him for driving while intoxicated, plaintiff told Hutchinson to "take it home." Hutchinson continued on and a short distance away struck a parked car. Plaintiff then arrested Hutchinson for DWI, and a blood test showed a blood alcohol level of .135. Plaintiff did not mention in his written report his first stop of Hutchinson, and he told Officer Wollman not to make a report of it on the basis that it was not necessary for him to make a report. On February 5, 1990, the City Commission upheld plaintiff's one-week suspension without pay. Plaintiff served the suspension from February 8 to 13, 1990.

On January 10, 1990, plaintiff wrote a letter to South Dakota Attorney General Roger Tellinghuisen asking for his legal opinion as to whether a police chief, mayor, or police commissioner had authority to void a traffic citation without the police officer's knowledge or consent. (Pl.Ex. 2.) Although this letter was not written on City of Madison letterhead, plaintiff signed it as "Captain Thomas Spiering" and listed the police department address. The Attorney General believed that plaintiff was acting in his official capacity as a police captain in requesting the opinion and for that reason responded by letter on January 24, 1990. (Pl.Ex. 3.) The Attorney General stated that a Chief of Police would have authority to decline to prosecute a traffic citation and a police commissioner

---

1. This statute provides in its entirety:
**9–29–23. Release and remission of penalties for ordinance violations.** The mayor in cities having a common council, and the governing body in all other municipalities may release any person imprisoned for violation of any ordinance or remit any fine or penalty for violation thereof, the reasons therefor being made a matter of record in the office of the auditor or clerk.

would have such authority if he was a certified law enforcement officer for the municipality, but a mayor would not have such authority.

Plaintiff showed this letter to his friend, Robert Broderick, who by that time had retired from his position of police captain several days after the City Commission terminated his employment on the recommendation of Commissioner Hanson and then reinstated him. Plaintiff and Broderick discussed the ticket voiding with Lake County States Attorney Wilson Kleibacker, who declined to initiate a prosecution against Madison city officials because of a possible conflict of interest. Plaintiff and Broderick then discussed the matter with special county prosecutor Glen Eng, who also declined to prosecute.

Plaintiff and Broderick decided to institute a recall petition in an effort to remove Commissioner Hanson from office.[2] Based upon the testimony of plaintiff and Broderick, the Court finds that neither plaintiff's letter to the Attorney General nor the recall petition were prompted by plaintiff's discipline resulting from the Hutchinson incident. In early February 1990, plaintiff and Broderick went to the law office of the late Carl Bohn and provided information which Bohn used to prepare a recall petition. The grounds stated on the petition, (Pl.Ex. 4), were that:

> Marvin O. Hanson has exceeded his authority as a City Commissioner of Madison, South Dakota, by obstructing a Madison City Police Officer in the performance of his official duties, by interfering with a uniform traffic ticket, issued by the Officer.

The Court finds that this language, as quoted from the recall petition, did not accuse Commissioner Hanson of the criminal offense of obstructing a police officer under South Dakota law, but expressed plaintiff's view of what he believed Commissioner Hanson had done that warranted a recall effort. Although the language used in the recall petition could have been more complete, the Court finds that the statement is not inaccurate or misleading.

Circulation of the petition began two to three weeks later. While off duty and dressed in plain clothes, plaintiff gave copies of the recall petition to three individuals to circulate for signatures. Broderick also circulated copies of the petition. Plaintiff did not ask or order anyone in the police department to sign the petition, and he did not devote any on-duty time to the recall effort. Commissioner Hanson learned of the recall from a citizen who showed him the petition. Commissioner Hanson believed plaintiff and Broderick were motivated by personal reasons. Commissioner Hanson told the Mayor and other commissioners about the recall petition just prior to a regular commission meeting and in doing so brought up the names of plaintiff and Broderick. Commissioner Hanson called Chief Gile on a Saturday morning and told him about the recall petition. Chief Gile immediately called plaintiff at home and told him that circulation of the petition was not in the best interest of the City of Madison. The Court finds that none of the defendants other than Commissioner Hanson actually read the recall petition until this suit began.

In a letter dated April 17, 1990, shortly after Commissioner Hanson learned of the recall petition, Chief Gile notified plaintiff that he would recommend plaintiff's termination. (Def.Ex. E.) In the letter, Chief Gile stated that plaintiff had

> continued to cause dissention within the department and exhibited conduct which has been detrimental to the efficiency and effectiveness of the operation of this department, to wit: you have circulated or caused to have circulated or assisted in the formulation of, a petition calling for the recall of Police Commissioner Marvin Hanson.... These facts [cited in the recall petition] were incomplete and misleading. The complete facts, if made known, would have negated any basis for the petition.

(*Id.* at 1.) Chief Gile stated that plaintiff had violated several policies of the City of Madi-

---

**2.** Broderick unseated Commissioner Hanson in a regular election and served as a Commissioner from 1991 to May 1994.

son and Madison Police Department, and he faulted plaintiff for failing to follow the chain of command regarding a complaint against a department head. (*Id.* at 2.) In a subsequent letter dated April 29, 1990, Chief Gile stated to plaintiff that "[y]ou must have realized that what you were undertaking was a very serious matter in becoming associated with the petition to have Police Commissioner Marv Hanson recalled and that you would be held accountable for your actions." (*Id.* at 3.) The Court finds that plaintiff's involvement in the recall petition prompted Chief Gile to recommend plaintiff's termination.

Plaintiff filed a grievance. (Pl.Ex. 6.) Plaintiff contacted attorney David Gienapp, who gave him legal advice only as to grievance procedures. Gienapp described plaintiff as devastated at the prospect of losing his job. The two of them met with Chief Gile in Step 1 of the grievance process as provided by the General Drivers and Helpers Union Local 749 contract in existence at that time. (Pl.Ex. 16 at 3–4.) The Court finds that, at the Step 1 meeting, Chief Gile gave as his primary reason for recommending termination that plaintiff was involved in the recall petition.

When the Step 1 meeting did not resolve the matter, plaintiff initiated Step 2 of the grievance process, a meeting with the Police Commissioner, which occurred on May 16, 1990. Attending this meeting were plaintiff, his attorney, Union Local 749 representative Ron Larsen, Chief Gile, Commissioner Hanson, and City Attorney Jay Leibel. At this meeting, the city officials cited the recall petition as the primary reason for plaintiff's termination. Plaintiff admitted that he had something to do with the recall petition, but he stated that he was not personally circulating it for signatures.

Following the Step 2 meeting, Commissioner Hanson signed a letter dated May 17, 1990, which had been authored by Chief Gile, advising plaintiff that his "employment with the City of Madison is terminated, effective May 19th, 1990, at 11:59 P.M., or in the event you are working that evening, the discharge will become effective at the end of the regularly scheduled shift, whichever is the [later]." (Pl.Ex. 5 at 2.) The Court finds that

Commissioner Hanson knew at the time he signed the letter that he did not have the authority to terminate plaintiff because termination required a majority vote of the full City Commission. The Court finds that plaintiff received the letter in the mail on May 18, 1990, and plaintiff believed that his employment would be terminated the following day.

In the May 17, 1990 letter, Commissioner Hanson listed five reasons why he concurred with Chief Gile's decision to terminate plaintiff. The first reason was:

> You were instrumental in the preparation and circulation of the petition calling for my recall. The petition sets forth facts obtained from you which were incomplete and misleading. Although the conduct you accuse me of involved another member of the commission, you directed the petition solely at me, thus demonstrating it was personal in nature. Your participation in the circulation of this petition was an action which was detrimental to the effectiveness of the Department and to the City of Madison. It further caused the Department and myself to lose confidence in your ability, honesty and integrity and make it impossible for us to work with you.

(Pl.Ex. 5 at 1.)

Other reasons given by Commissioner Hanson included failure to follow the chain of command and violation of city and police department policies. The Court finds that these other reasons were pretextual. At trial, Commissioner Hanson could not explain why he included these reasons as a basis to fire plaintiff, and defendants offered insufficient evidence to convince the Court by a preponderance of the evidence that plaintiff's involvement in the recall petition caused dissension or disruption in the police department. Upon questioning by the defense, Chief Gile and officers Johnson and Haug testified that a certain amount of dissension was normal, they and other officers continued to do their work as required, and law enforcement in the community did not suffer. The Court finds that the voiding of the ticket caused dissension within the Madison Police Department. As the fifth and last reason given in the May 17, 1990 letter, Commis-

sioner Hanson referred to two previous reprimands plaintiff had received, and stated that "this violation constitutes a third offense[.]" (Pl.Ex. 5 at 2.) The Court finds that Commissioner Hanson was referring to plaintiff's involvement in the recall petition as the "third offense" because defendants produced no evidence that plaintiff had done anything else to warrant discipline between the time he finished serving his one week suspension in February 1990 for the Hutchinson incident and Commissioner Hanson's May 17, 1990 termination letter.

After receiving Commissioner Hanson's letter, plaintiff proceeded to Step 3 of the grievance process by requesting a hearing before the full City Commission. The City Commission scheduled a hearing for May 29, 1990, at the City Commission Room at Madison City Hall. (Pl.Ex. 7.) Plaintiff discussed the upcoming May 29 hearing with attorney Gienapp. The Court finds that, primarily because of plaintiff's financial considerations, plaintiff and his attorney agreed that the attorney would not attend the hearing. On May 29, after finishing normal business, the commission entered an executive session about 9:00 o'clock p.m. Union representative Ron Larsen represented plaintiff at the hearing. Larsen, plaintiff, and the commission members discussed the contents of Commissioner Hanson's May 17, 1990 letter. The commission then asked plaintiff and Larsen to step into the hall, and the commission members continued to discuss the matter with City Attorney Leibel. The Court finds that Commissioners Hanson and Lee favored termination, while Mayor Krantz and Commissioner Joanne Gagnon did not favor termination. The testimony is not clear as to how former Commissioner Robert Hall might have voted if a motion to terminate plaintiff had been made. Although the minutes of the open commission meeting reflect that Commissioner Hall actively participated in the meeting, he is now quite elderly and was unable to testify at trial.

The Court finds that ultimately the commission reached a consensus and dispatched City Attorney Leibel to the hall, where plaintiff and Larsen were waiting, to offer plaintiff a settlement agreement. Leibel told plaintiff and Larsen that plaintiff could retain his employment if he would agree to accept a demotion to the position and 1990 rate of pay for a Patrolman II and agree that he would not be eligible for a promotion or raise for a period of one year from the date of the agreement. The position of Patrolman II is the second lowest pay grade in the police department. The Court finds that, as Captain, plaintiff earned annual gross wages of $22,568 (not including overtime), plaintiff stood to lose health insurance, some retirement benefits, and law enforcement certification if terminated, his wife earned only $125 per month, and they had $1,000 to $1,500 in savings with no other investments except the equity in their mortgaged home. Plaintiff and Larsen discussed the offer alone for a few minutes and further discussed the offer with Leibel. The Court finds that the commission's settlement offer and the ensuing brief negotiations between Leibel, plaintiff, and Larsen were directed toward precluding plaintiff from taking any further appeal of a commission decision to terminate plaintiff's employment to the state Department of Labor and possibly to state circuit court as permitted by state law. The Court finds there is no evidence showing that Leibel and Larsen discussed with plaintiff any legal remedies he might have had other than the appeal of his grievance. Plaintiff and Larsen then returned to the commission room, where plaintiff told the Mayor and the Commissioners that he understood the agreement and orally accepted it. The Court finds that defendants would not permit plaintiff to return to work until a written agreement was signed, and the Mayor and Commissioners directed Leibel to draft the agreement. The Mayor adjourned from executive session at 10:50 p.m., the Commission noted plaintiff's demotion in open session, and the Commission adjourned at 10:55 p.m. (Pl.Ex. 13.)

The Court finds that Leibel drafted the written "Agreement" which states, in pertinent part:

It is also hereby agreed that this agreement shall constitute settlement in full *of the grievance* previously filed by Mr. Spiering against the City of Madison. Neither the City of Madison, Tom Spiering, or

Local Union 749 *will appeal this grievance further.*

(Pl.Ex. 8 (emphasis added).) Plaintiff did not discuss the terms of this written agreement with Larsen or express any misgivings about it after orally accepting the settlement on May 29. The Court finds that plaintiff contacted attorney Gienapp on June 1 and told him a settlement had been reached, but plaintiff did not show Gienapp the agreement and he did not ask for or receive any advice from Gienapp about the terms of the agreement. Larsen attempted to expedite the signing of the agreement so that plaintiff could return to work. On June 4, 1990, plaintiff and Larsen signed the agreement in Chief Gile's office. Leibel included a signature line for Larsen to eliminate any doubt as to whether the union would have a right to appeal plaintiff's grievance to the state Department of Labor. Mayor Krantz signed the agreement in her office the same day.

The Court finds that the written agreement is unambiguous on its face. By its express language, the agreement settled only plaintiff's grievance and any further appeal of the grievance by plaintiff to the state Department of Labor in the event the commission decided to terminate his employment. The written agreement by its express terms did not compromise any other legal remedy plaintiff had, including this suit under section 1983.

Alternatively, the Court finds that plaintiff did not voluntarily waive his right to bring this suit by signing the agreement. The Court finds that plaintiff completed only the eighth grade and he has not had any formal education beyond that except to obtain a GED in 1966. Plaintiff is not a sophisticated person and he did not have the advice and representation of counsel during the negotiations at the May 29, 1990 hearing. Leibel and Larsen did not discuss with plaintiff any other legal remedies he might have had other than a grievance appeal. Although plaintiff was not unwilling to enter into the agreement, plaintiff felt coerced by the economic duress he was experiencing at the time of the negotiations. In weighing the costs and benefits to himself and his family, plaintiff felt compelled to save his employment because he did not believe he could find a new law enforcement position at his age, and plaintiff had minutes, not days, to think the settlement over and to decide to accept the agreement.

Alternatively, even if plaintiff voluntarily signed the agreement, the Court finds that the agreement lacked consideration. As will be discussed more fully below, on May 29, 1990, plaintiff had an indisputable right to remain in the Captain's position.

## II. Conclusions of Law

*The Settlement Agreement*

■ The parties do not cite, and the Court has not found, a factually similar case in which a public employee faced termination for exercising First Amendment rights and then signed an agreement or release accepting a demotion in an effort to remain employed. The Court concludes that the Eighth Circuit would hold that a public employee may knowingly and voluntarily waive a section 1983 action arising out of an employment dispute because the courts have already so held in the criminal context, see *Town of Newton v. Rumery*, 480 U.S. 386, 398, 107 S.Ct. 1187, 1194–95, 94 L.Ed.2d 405 (1987); *Woods v. Rhodes*, 994 F.2d 494, 502 (8th Cir.1993), and the Eighth Circuit has held that employees can knowingly and voluntarily waive Title VII, ADEA, and ERISA claims arising from employment disputes. *Warnebold v. Union Pac. R.R.*, 963 F.2d 222, 224 (8th Cir.1992) (Title VII and ADEA); *Leavitt v. Northwestern Bell Tele. Co.*, 921 F.2d 160, 162–63 (8th Cir.1990) (ERISA claim); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 540 (8th Cir.) (ADEA claim), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); *Moore v. McGraw Edison Co.*, 804 F.2d 1026, 1033 (8th Cir.1986) (ADEA claims); *Pilon v. University of Minn.*, 710 F.2d 466, 467–68 (8th Cir.1983) (Title VII claim).

■ Courts are bound to give the language used in a release its plain, ordinary meaning. *Grant County Sav. & Loan Ass'n v. Resolution Trust Corp.*, 968 F.2d 722, 724 (8th Cir.1992) (per curiam). The Court has found that the agreement unambiguously settled only plaintiff's grievance and any further

appeal of it. City Attorney Leibel drafted the agreement narrowly and did not include a "broad and all encompassing" phrase releasing defendants from "any and all claims," as in *Grant*, 968 F.2d at 725. *See also Rumery*, 480 U.S. at 390, 107 S.Ct. at 1191 (section 1983 case where release precluded any claims); *Woods*, 994 F.2d at 497 (section 1983 case where release contained the phrase "any and all liability whatsoever"); *Warnebold*, 963 F.2d at 223 (Title VII and ADEA case where release precluded "any and all claims, causes of actions and liabilities of any kind or nature including, ... claims under Title VII"); *Leavitt*, 921 F.2d at 161 (ERISA case where general release provided that plaintiff would not sue on any known or unknown claims of any nature); *Lancaster*, 809 F.2d at 540 (ADEA case where release precluded "each and every claim of any kind ... resulting from [his] termination of employment"); *Moore*, 804 F.2d at 1029 (ADEA case where release precluded any claims); *Pilon*, 710 F.2d at 467 (Title VII case where release precluded "any and all claims which may have been asserted in a certain action pending in Hennepin County District Court"). Thus, construing the written agreement against defendants as the drafters under ordinary contract principles, *Grant*, 968 F.2d at 724; *H.C. Clark Implement Co. v. Wiedmer*, 389 N.W.2d 816, 818 (S.D.1986), the Court reached its finding that the agreement does not waive this suit.

Alternatively, the Court has found that plaintiff did not knowingly and voluntarily waive his right to bring this action by signing the agreement. Voluntariness is a fact question. *Woods*, 994 F.2d at 499–500 (instructing courts to consider such factors as sophistication of signer, cost/benefit considerations by signer, circumstances of signing, whether signer had counsel, the time given signer to consider the release, whether signer's attorney drafted the release, whether signer expressed any unwillingness to sign, and whether release is clear on its face). The Court carefully considered these factors in finding that plaintiff did not voluntarily enter into the agreement. Thus, the Court concludes that plaintiff did not waive this section 1983 suit.

Consideration for a release requires mutual concessions, and a release is not supported by sufficient consideration unless plaintiff received something of value to which he had no previous right. *Maynard v. Durham & S. Ry. Co.*, 365 U.S. 160, 163, 81 S.Ct. 561, 562–63, 5 L.Ed.2d 486 (1961); *Burns v. Northern Pac. Ry. Co.*, 134 F.2d 766, 770 (8th Cir.1943). *Cf. Warnebold*, 963 F.2d at 223 (holding that agreement did not lack consideration where plaintiff received a substantial monetary payment in exchange for release of a contested right to benefits). Because the Court concludes that defendants unconstitutionally demoted plaintiff for exercising First Amendment rights, the Court finds that the agreement lacked sufficient consideration.

*First Amendment Analysis*

It is clearly established that a public employer "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Casey v. City of Cabool*, 12 F.3d 799, 802 (8th Cir.1993). To be protected, the employee's speech must be on a matter of public concern, and the employee's interest in expressing himself on the matter must not be outweighed by the employer's interest in promoting efficiency of public service through its employees. *Waters v. Churchill*, —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (plurality); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The first step of the constitutional analysis, then, requires an inquiry into whether plaintiff's speech is constitutionally protected and a balancing of his interest in free speech against defendants' interest in efficient administration. *See Casey*, 12 F.3d at 802.

Whether speech is a matter of public concern is a question of law, and the Court must consider the content, form, and context of the speech, as revealed by the whole record. *Connick*, 461 U.S. at 147–48 & n. 7, 103

S.Ct. at 1690 & n. 7. In contrast to *Waters,* ⎯⎯ U.S. at ⎯⎯⎯–⎯⎯, 114 S.Ct. at 1882–84, here there is no dispute as to what the speech was for purposes of applying the *Connick* test. Thus, the *Waters* plurality opinion is distinguishable from the case at bar and need not be applied other than to note the Supreme Court's reaffirmation of the *Pickering* and *Connick* analyses.

▮▮▮▮▮ The Court concludes that plaintiff's speech was a matter of public concern under *Connick.* Plaintiff knew that Police Commissioner Hanson, an elected city official, had directed Chief Gile not to process through the court system a lawful traffic citation written by plaintiff, and plaintiff sincerely believed that such conduct undermined law enforcement. Plaintiff could not follow the established chain of command to rectify what he perceived as a threat to law enforcement because the involved officials were his immediate superiors, and they had already made clear to him their views. Plaintiff sought to bring the conduct to the attention of Madison citizens on his off-duty hours through a recall petition so that the citizens could determine whether Commissioner Hanson's actions impaired the Madison Police Department in discharging its responsibilities to investigate and prosecute traffic offenses. Plaintiff did not even tell Officer Haug, with whom he rode daily, about the recall petition. Although plaintiff and Broderick initiated the recall petition about the time plaintiff served a disciplinary suspension for another matter, the Court has found that retaliation by plaintiff was not the motive for the recall petition. Defendants may have taken great offense to the content of the recall petition, but offensiveness is irrelevant to whether a matter is of public concern. *See Casey,* 12 F.3d at 803. It is clearly a matter of public concern that elected officials would give preferential treatment in the enforcement of a city ordinance.

▮▮▮▮▮ "The *Pickering* balance requires the court to decide each claim on a case by case basis giving full consideration to the government's interest in efficient public service." *Bowman v. Pulaski County Special School Dist.,* 723 F.2d 640, 644 (8th Cir.1983) (citing *Connick,* 461 U.S. at 148–52, 103 S.Ct.

at 1691–92). The Court must weigh six factors in striking this balance. *Bowman,* 723 F.2d at 644; *Shands v. City of Kennett,* 993 F.2d 1337, 1344 (8th Cir.1993), *cert. denied,* ⎯⎯ U.S. ⎯⎯, 114 S.Ct. 880, ⎯⎯ L.Ed.2d ⎯⎯ (1994). The first two factors address the need for harmony in the workplace and whether the government's responsibilities require a close working relationship to exist between plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate. *Bowman,* 723 F.2d at 644. The Court recognizes that the Madison Police Department has a significant interest in regulating the speech activities of its officers to promote efficiency, foster loyalty and obedience to authority, maintain morale or *esprit de corps,* and instill public confidence. *See Hughes v. Whitmer,* 714 F.2d 1407, 1419 (8th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). Defendants' view that plaintiff's speech contributed to dissension within the ranks would be entitled to considerable deference, as would be their decision to discipline plaintiff for his speech, if the speech had caused such dissension. *Id.* The facts, however, do not bear out defendants' view. *See Buzek v. County of Saunders,* 972 F.2d 992, 995 (8th Cir.1992) (holding that deputy's letter was protected speech where defendants failed to offer any proof of detrimental impact on the department). *Cf. Breuer v. Hart,* 909 F.2d 1035, 1041 (7th Cir.1990) (upholding decision for defendants on *Pickering* balance because there was "strong evidence" speech interfered with work of plaintiff and co-workers). Chief Gile himself told Commissioner Hanson that the Harmon ticket should be processed. Gile testified that a certain amount of dissension about pay, hours of work, personalities, and promotions is common in the Madison Police Department and similar dissension has occurred in every police department in which he has worked. Gile also testified that his staff acted professionally and continued to carry out law enforcement responsibility. Defendants produced no other evidence to the contrary or to show that the speech even had the potential for disruption. The Court has found that the voiding of the ticket caused dissension, not plaintiff's speech.

Therefore, the speech did not cause disharmony in the workplace or impair close working relationships.

The remaining four factors are the time, manner, and place of the speech; the context in which the speech arose; the degree of public interest in the speech; and whether the speech impeded the employee's ability to perform his or her duties. *Bowman,* 723 F.2d at 644. The Court previously discussed the time, manner, place, and context of the speech in determining that the speech was on a matter of public concern and, based on the earlier discussion, the Court concludes that these factors weigh in favor of plaintiff's speech. The evidence shows that there was significant public interest in the speech, and the Court earlier found that the speech did not impair the ability of plaintiff or any other police officer to perform law enforcement duties. *See Casey,* 12 F.3d at 803. Therefore, all of these factors also weigh in favor of plaintiff's speech in striking the *Pickering* balance.

 The final steps of the First Amendment analysis are to determine whether plaintiff's speech was a substantial or motivating factor in defendants' decision to demote plaintiff, and whether defendants would have reached the same decision to demote plaintiff in the absence of the protected speech. *See Mt. Healthy City School Dist. Bd. of Educ.,* 429 U.S. 274, 285, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). The Court determines that plaintiff has met his burden by a preponderance of the evidence to show that his protected speech was a substantial or motivating factor in defendants' decision to demote him. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. The Court determines that defendants have failed to carry their burden by a preponderance of the evidence to show that they would have reached the same decision even if plaintiff's speech had not occurred. *See id.* But for the recall petition, plaintiff would not have been demoted. *See Brockell v. Norton,* 732 F.2d 664, 666 (8th Cir.1984) (noting that defendants admitted speech was the sole reason for discharge).

 Accordingly, the Court concludes that defendants violated plaintiff's clearly established First Amendment right to free speech when they demoted him for his involvement in the recall petition. *See Casey,* 12 F.3d at 804 ("[n]o right is more clearly established in our republic than freedom of speech."). The defendants are not entitled to qualified immunity because they failed to show that plaintiff's speech adversely affected the Madison Police Department. *See id.; Powell v. Basham,* 921 F.2d 165, 168 (8th Cir.1990) (per curiam) (noting that defendants on summary judgment had not yet produced evidence of disruption). *Cf. Grantham v. Trickey,* 21 F.3d 289, 295 (8th Cir. 1994) (upholding grant of qualified immunity because disruption due to speech established); *Bartlett v. Fisher,* 972 F.2d 911, 917–18 (8th Cir.1992) (holding that defendants were entitled to qualified immunity because they acted in objectively reasonable manner in light of plaintiff's disruptive speech). The Court has not considered *Bahr v. City of Madison,* Civ 90–4145 (D.S.D.1991).

*Relief*

At the close of trial, plaintiff abandoned his request for reinstatement to the position of Captain. The Court finds that plaintiff is entitled to back pay. During trial, the Court permitted the introduction of evidence as to a disciplinary action against plaintiff in 1991 for the limited purpose of establishing, in the event the Court found in plaintiff's favor on the First Amendment claim, whether plaintiff is entitled to back pay at the Captain's rate of pay from June 1, 1990, to the present.

 The City Commission disciplined plaintiff by imposing a one day suspension without pay on June 11, 1991. (Def.Ex. G.) The Commission imposed the suspension because plaintiff made a racist remark over police radio while riding in his patrol car near the site where another officer had stopped an African–American motorist. Although defendants Gile and Lee testified that plaintiff likely could not have continued as a supervising officer if he had been a Captain when this incident occurred, the Court finds this testimony is insufficient to prove that the Commission would have demoted or terminated plaintiff, particularly when the Com-

mission imposed a one-day suspension after Chief Gile recommended a three-day suspension. (Def.Ex. G.)

In calculating the amount of back pay, the Court finds that the City of Madison operates on a calendar year basis and pays its police officers hourly wages. From January 1990 through the present date, the City of Madison has awarded its police officers annual pay raises of 35 cents per hour. These raises have been paid incrementally, with 25 cents per hour paid as of January 1 and 10 cents per hour paid as of July 1 each year. The Court finds that an employee working a regular schedule of 40 hours per week for 52 weeks works a total of 2,080 hours per year or 1,040 hours every six months. The Court finds that such an employee works approximately 173 hours per month (2,080/12 months). Because the parties introduced no evidence as to the impact of plaintiff's overtime hours and vacation, sick, or personal leave, the Court has not factored these benefits into the equations which follow.

The Court finds that, as of June 1, 1990, the pay rate for the position of Captain was $10.85 per hour, while the pay rate for the position of Patrolman II was $9.43 per hour. Thus, the hourly pay differential was $1.42. For the month of June 1990, the Court finds that plaintiff lost $245.66 in hourly wages (173 hrs. × $1.42). The Court finds that, on July 1, 1990, plaintiff would have received a $.10 per hour pay raise, if he had remained in the Captain's position, but he did not receive this raise because of his demotion. Thus, for the months of July to December 1990, the hourly pay differential increased to $1.52 per hour. The Court finds that, from July 1 to December 31, 1990, plaintiff lost a total of $1,580.80 in wages (1,040 hours at $1.52 per hour). The Court further finds that, on January 1, 1991, plaintiff would have received a $.25 per hour pay raise, if he had remained in the Captain's position, but he did not receive this raise because of his demotion. Thus, for the months of January through June 1991, the hourly pay differential increased to $1.77 per hour, resulting in a loss of wages to plaintiff for those months of $1,840.80 (1,040 hours at $1.77 per hour).

The Court finds that, on July 1, 1991, plaintiff received the $.10 per hour pay increase given to all police officers, and since then he has continued to receive the same pay raises as other officers. Because plaintiff would have received these raises had he retained the position of Captain, the pay differential from July 1, 1991, through the present remains at $1.77. The Court finds that, from July 1 to December 31, 1991, plaintiff lost a total of $1,840.80 in wages (1,040 hours at $1.77 per hour).

The Court finds that, for calendar years 1992 and 1993, plaintiff lost a total of $7,363.20 in wages (4,160 hours at $1.77 per hour). The Court finds that, from January 1 through July 1994, plaintiff lost a total of $2,143.47 in wages (1,211 hours (173 hrs. × 7 months) at $1.77 per hour). Adding these subtotals together ($245.66, $1,580.80, $1,840.80, $1,840.80, $7,363.20, and $2,143.47), the Court finds that plaintiff lost a grand total of $15,014.73 in wages because of the hourly decrease in pay and withheld pay raises resulting from his demotion. Plaintiff is entitled to pre-judgment interest on this amount at the state statutory interest rate of twelve percent, which is $7,507.38. *See* S.D.C.L. §§ 21–1–13.1, 54–3–4, 54–3–16; *Winter v. Cerro Gordo County Conservation Bd.*, 925 F.2d 1069, 1073 (8th Cir.1991).

If plaintiff had remained in the Captain's position, as of July 1, 1994, plaintiff would be making $12.35 per hour, or $25,688 annually. The Court finds that, as of July 1, 1994, plaintiff is earning $10.58 per hour as a Patrolman II, or $22,006.40 annually, a difference of $3,681.60 annually. This difference impacts plaintiff's potential retirement benefits.

The Court finds that plaintiff is a Class B participant in the South Dakota Retirement System. Class B participants are eligible for full retirement benefits at age 55. The Court finds that plaintiff was eligible for full retirement as of June 1, 1990, but plaintiff chose to continue working after he was demoted, as was his right. The Court finds that plaintiff now has approximately twelve years of credited law enforcement service due to his employment with the City of Madison since 1982. No evidence was presented

that plaintiff "bought back" his years of law enforcement experience prior to 1982 to credit toward retirement benefits, as would be permitted under the retirement system. Annual retirement benefits are calculated by multiplying the years of credited law enforcement service by two percent of the participant's final average salary.

If plaintiff were still a Captain and chose to retire, he would receive $6,165.12 annually in retirement benefits (12 yrs. × 2% of $25,688). At plaintiff's current rate of pay, however, he is entitled to $5,281.54 annually in retirement benefits, a difference of $883.58 per year. Having consulted a standard mortality table without defense objection, the Court finds that plaintiff, who is now 60 years old, has a life expectancy of 17 years (based on plaintiff's age of 54 years in 1988). *Am.Jur.2d Desk Book*, Item No. 92 (1992). Thus, plaintiff's retirement benefits based upon his years of service to the Madison Police Department will be decreased by $15,020.86 because of his demotion. The Court finds that plaintiff is entitled to $15,020.86, discounted to present value over the stream of payments at a rate of 4 percent, which is $10,751.41.

The Court finds that plaintiff has suffered increased physical problems since the demotion, including a mild stroke in May 1994, but plaintiff did not prove that his physical ailments are the result of defendants' actions. Plaintiff has, as a result of defendants' actions, experienced mental anguish and suffering, personal humiliation, and impairment of his reputation as a result of his demotion. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986); *Jackson v. Crews*, 873 F.2d 1105, 1109 (8th Cir.1989). As to mental suffering, the Court finds that the demotion required plaintiff to report to officers who were once his subordinates and who are less experienced, adding to his loss of self-confidence. Plaintiff is preoccupied with the demotion, he is depressed, and his marital relationship has suffered. For all of these losses, the Court finds that plaintiff is entitled to compensatory damages in the amount of $46,000 from the City of Madison and the individual defendants in their official capacities. *See Buzek*, 972 F.2d at 994–96; *Parrish v. Luckie*, 963 F.2d 201, 206–07 (8th Cir.1992).

■ The factfinder may assess punitive damages under section 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *Standley v. Chilhowee R–IV School Dist.*, 5 F.3d 319, 323 (8th Cir.1993). The Court finds that plaintiff is entitled to punitive damages in the amount of $2,000 from former Police Commissioner Marvin O. Hanson in his individual capacity. The Court finds that defendant Hanson was motivated by reckless disregard for plaintiff's constitutionally protected right of free speech when he sent plaintiff the May 17, 1990 letter terminating plaintiff's employment within forty-eight hours, even when defendant Hanson knew that he did not have final authority to terminate plaintiff.

Finally, the Court finds that plaintiff is a prevailing party, *see Casey*, 12 F.3d at 804, and plaintiff is entitled to costs and reasonable attorneys' fees under 42 U.S.C. § 1988.

Accordingly, IT IS HEREBY ORDERED that the Court shall enter its declaratory judgment that defendants violated plaintiff's First Amendment right to freedom of speech.

IT IS FURTHER ORDERED that the City of Madison and individual defendants in their official capacities shall pay to plaintiff back pay in the total amount of $15,014.73, plus pre-judgment interest of $7,507.38, for a total amount of $22,522.11.

IT IS FURTHER ORDERED that the City of Madison and individual defendants in their official capacities shall pay to plaintiff lost retirement benefits in the amount of $10,751.41.

IT IS FURTHER ORDERED that the City of Madison and individual defendants in their official capacities shall pay plaintiff compensatory damages in the amount of $46,000.

IT IS FURTHER ORDERED that defendant Marvin O. Hanson in his individual ca-

pacity shall pay plaintiff punitive damages in the amount of $2,000.

IT IS FURTHER ORDERED that plaintiff is entitled to post-judgment interest on all amounts awarded by the Court until paid, in accordance with 28 U.S.C. § 1961 and applicable caselaw.

IT IS FURTHER ORDERED that plaintiff's attorneys shall submit within ten days of this date itemized billing statements for time and costs expended in relation to this lawsuit.

IT IS FURTHER ORDERED that all pending motions are denied as moot.