Kevin SHEPARD, Plaintiff,

v.

WAPELLO COUNTY, IOWA and
Wapello County Sheriff Donald
Kirkendall, Defendants.

No. 4:02–CV–30260.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 31, 2003.

Paige E. Fiedler, Beth A. Townsend, Fiedler & Townsend PLC, Johnston, IA, for plaintiff.

Mark W. Thomas, Grefe & Sidney PLC, Des Moines, IA, for defendants.

## RULING ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR NEW TRIAL

WALTERS, United States Chief Magistrate Judge.

The above resisted motion is before the Court (# 57). It is determined on the motion papers. LR 7.1(c).

**I.**

## NATURE OF THE CASE AND PROCEDURAL BACKGROUND

Kevin Shepard was fired by Wapello County Sheriff Donald Kirkendall from Shepard's job as the Assistant Jail Administrator of the Wapello County, Iowa Jail. Sam Craven was the Chief Jail Administrator. Shepard claimed he was fired for providing information to Sheriff Kirkendall about alleged misconduct of Craven in connection with the transport of prisoner Patricia McKim and for making statements to County Supervisor Jerry Parker regarding the inadequacy of the Sheriff's budget for overtime hours. Shepard brought three causes of action. First, he claimed his discharge for providing information about Craven's alleged misconduct was wrongful because it violated Iowa public policy. His employer, Wapello County, was the sole defendant on this claim. See Theisen v. Covenant Med. Ctr., Inc., 636 N.W.2d 74, 79 (Iowa 2001) (citing Springer v. Weeks & Leo Co., 429 N.W.2d 558, 560 (Iowa 1988)); Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 282–84 (Iowa 2000). Second, he claimed Sheriff Kirkendall violated Iowa's "whistleblower" law which prevents reprisal against an employee of a political subdivision for disclosing information to a public official concerning violations of law or rule, abuse of authority, or dangers to public health or safety. Iowa Code § 70A.29(1), (3). Kirkendall was the sole defendant on this claim. Lastly, Shepard claimed that both Wapello County and Sheriff Kirkendall retaliated against him for the exercise of his First Amendment free speech right in providing information about Craven's alleged misconduct and complaining about the budget to Supervisor Parker. The budget issue was involved only in this last claim, and both Wapello County and Kirkendall were

defendants. The First Amendment claim was brought under 42 U.S.C. § 1983.

The case was assigned to the undersigned pursuant to 28 U.S.C. § 636(c). It came on before the Court and a jury for trial on July 28, 2003. On August 1, 2003 the jury returned a verdict in favor of plaintiff and against both defendants on all three counts. It found damages in the total amount of $378,027 consisting of $88,027 for past lost wages and benefits, $40,000 for future lost wages and benefits, $200,000 for past mental or emotional pain and suffering and $50,000 for future mental or emotional pain and suffering. The Court submitted future lost wages and benefits on the state and federal statutory claims on an advisory basis. Fed.R.Civ.P. 39(c). In memorandum findings entered August 4, 2003, the Court adopted the jury's future lost wages and benefits finding as an appropriate front pay award on the statutory claims. Judgment for the amounts found by the jury was entered on August 1, 2003. The present motion for judgment as a matter of law or for new trial was filed on August 7, 2003.

Though the grounds for judgment as a matter of law and new trial are somewhat intermixed in defendants' motion papers, it appears judgment as a matter of law is based on the contentions: (1) Sheriff Kirkendall is entitled to qualified immunity, a defense which goes to the § 1983 claim (and would by extension, result in judgment for the county); (2) the county is not liable on the § 1983 claim because the Sheriff's discharge decision did not represent county policy giving rise to municipal liability; (3) with respect to the § 1983 claim concerning the budget issue the evidence was insufficient to establish that Sheriff Kirkendall was aware of the substance of the conversation between Supervisor Parker and Shepard; and (4) there was a failure of proof on the state statutory whistleblower claim.

Defendants reassert a number of complaints about the Court's instructions and evidentiary rulings, and argue that the damage award for emotional pain and suffering is excessive. These are all potential grounds on which to base a new trial. In addition, defendants argue that a new trial should be granted because the verdict is against the weight of the evidence.

## II.

## JUDGMENT AS A MATTER OF LAW

### Legal Standard

Defendants appropriately raised all of the grounds on which they seek judgment as a matter of law in their Fed.R.Civ.P. 50(a) trial motions. Accordingly, these issues are properly before the Court. *Id.* 50(b).

Defendants' JAML issues raise both questions of law and fact. To the extent the issues incorporate questions about the sufficiency of the evidence to support the factual basis for the verdict, defendants must satisfy a high standard:

Judgment as a matter of law is proper "[o]nly when there is a complete absence of probative facts to support the conclusion reached" so that no reasonable juror could have found for the nonmoving party.

*Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 615 (8th Cir.2000) (quoting *Hathaway v. Runyon,* 132 F.3d 1214, 1220 (8th Cir.1997)); *see Eich v. Bd. of Regents for Cent. Mo. State Univ.,* 350 F.3d 752, 761 (8th Cir.2003) (also quoting *Hathaway,* 132 F.3d at 1220); *Jaros v. LodgeNet Entertainment Corp.,* 294 F.3d 960, 965 (8th Cir.2002). In applying this standard, all of the facts are to be looked at in the light most favorable to the nonmoving party. *Warren v. Prejean,* 301 F.3d 893, 900 (8th Cir.2002). "[T]he court must assume as proven all facts that the nonmoving party's

evidence tended to show, give [him] the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in [his] favor." *Hathaway,* 132 F.3d at 1220; *see Lawrence v. Bowersox,* 297 F.3d 727, 731 (8th Cir.2002). Defendants must demonstrate that all of the evidence points in their direction and "is susceptible of no reasonable interpretation sustaining" Shepard's claims. *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1006 (8th Cir.2000); *see Garcia v. City of Trenton,* 348 F.3d 726, 727 (8th Cir.2003). The Court "may not make credibility determinations or weigh the evidence" in considering a JAML motion. *Garcia,* 348 F.3d at 727 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

### Factual Background

To understand the JAML issues, it is appropriate to first review the factual background of the case. What follows generally presents the evidence in the light most favorable to plaintiff. Shepard was hired as a correctional officer at the Wapello County jail in November 1997. The jail is operated by the Sheriff's department. Shepard eventually rose to the position of Assistant Jail Administrator when Wapello County opened a new law center and correctional facility in November 2000. As noted, Sam Craven was the Chief Jail Administrator. Shepard reported to Craven and Craven, in turn, reported to Sheriff Kirkendall.

By his own admission, Shepard tended to be loud, demonstrative, frequently used vulgar language, and was given to gesticulating in his interactions with others at work. He was the type of person who gave his opinions freely and forcefully. Still, he was a capable employee as evidenced by the position he occupied at the time of his discharge.

Craven had an altercation with an inmate in the course of which he suffered a serious back injury. He had surgery in April 2000 and was off work for an extensive period of time. Shepard took over the functions of his job. For a time it was doubtful whether Craven would return. Shepard hoped he would not and, it was apparent from the testimony, wanted to succeed Craven. Shepard thought he was better at the job. He testified he was more consistent in dealing with the correctional officers, backed the correctional officers up in their dealings with inmates (unlike Craven who tended to tell people what they wanted to hear), and overall was a better manager.

Craven did return to the job in August 2000. His relationship with Shepard deteriorated from that point. Craven was still experiencing problems with pain, was taking medication, and was frequently absent from work because of his medical condition. Shepard testified Craven seemed preoccupied with his back, admitted he was affected by the medication he was taking, tended to fall asleep, and generally neglected his duties. Shepard told the Sheriff what he thought about Craven's job performance and, according to Shepard, the Sheriff admitted Craven was struggling. Craven was aware of Shepard's comments to the Sheriff. He in turn complained to the Sheriff about Shepard, who he now disliked. He told the Sheriff (with some reason) he thought Shepard was out to get him and that he could not work with Shepard. Shepard testified Sheriff Kirkendall expressed his frustration with the situation, saying to Shepard something like "you guys don't like each other and I don't know what to do about it."

In the midst of this state of affairs there arrived, in May 2001, the strange tale of the transport of prisoner Patricia McKim in August 1998. McKim had been serving time in Arizona. At the conclusion of her

sentence, she was turned over to Iowa authorities to be extradited to Iowa to answer to pending charges, the most serious burglary. Craven and correctional officer Katie Leinhauser (now Courtney) traveled in August 1998 by train to Tucson, Arizona to pick her up.

In early 2001 McKim was working at a refrigeration company with Shawn Smithart. She confided in Smithart about some unusual happenings during the 1998 extradition trip. Smithart passed the information on to Kevin Mineart, a Wapello County jail correctional officer and friend of Shepard who Shepard supervised. The time frame is not clear, but on or about May 10, 2001 Mineart, with Smithart at his elbow, called Shepard at home and said he had been told an incredible story about McKim. Smithart got on the phone and, either then or in subsequent conversations, relayed what McKim had told him. He said that Craven and Leinhauser had taken McKim's shackles and cuffs off for the three-day train ride back to Chicago, and on to Ottumwa, Iowa. Smithart told Shepard McKim had said Craven purchased cigarettes and beer for her on the train, she had spent a lot of time in the smoking car with Craven, she had been allowed free rein on the train, she met a man on the train with whom she smoked marijuana and used cocaine, and Craven was drunk during most of three-day journey. McKim said they arrived late in Chicago and had missed the connecting train to Ottumwa. The railroad put them up in a hotel and McKim was given her own room in which she was unsupervised. McKim told Smithart she, Craven and Leinhauser left the hotel to get something to eat. Leinhauser had loaned her a t-shirt to wear. According to McKim, the three went to a restaurant, and McKim drank beer with Craven and the man she had met on the train (who

had joined them). The story continued that after eating Craven, McKim and the unidentified man went to a nearby "cop bar" where they drank and played pool with an off-duty police officer. McKim and the man reportedly used more cocaine at the bar. The three stayed at the bar until it closed at approximately 4:00 a.m., when they returned to the hotel. The next day they caught the train to Ottumwa.

Shepard suggested that Smithart attempt to get McKim to put her story in writing, but said he would talk to McKim if she called him. Shepard "wanted to check things out a little bit" before he told the Sheriff. He testified he felt terrible about the allegations concerning his boss, that they were a "gut wrenching" thing to know.

Mineart called Shepard after the conversation with Smithart and told him the story must have been true. He recalled that shortly after she returned from the trip in 1998 Leinhauser told him and correctional officer Brian Buza parts of the story Smithart had relayed, namely that Craven had purchased alcohol for McKim, taken her to a bar and given her clothing. Mineart testified that at the time he heard this from Leinhauser he did not know whether or not to believe the story and had told no one.[1]

Smithart contacted McKim and McKim called Shepard. They met at McKim's apartment on Saturday, May 12, 2001. Shepard testified that, with minor variations, McKim repeated essentially the same story Smithart had said she had told him. Shepard testified that in following up with McKim he felt he was acting more as a private citizen than as a member of the jail staff.

Judson Letts, who as a previous jail resident knew who Shepard was, saw

1. In her testimony Leinhauser denied making these statements to Mineart. Buza testified Leinhauser did not say anything about alcohol use by Craven or McKim.

Shepard leaving McKim's apartment and questioned McKim. McKim called Shepard and told him about Letts and that she had told Letts what she and Shepard had discussed. She also told Shepard that Letts was going to call Craven.

Shepard testified he felt horrible that the information about the McKim trip had been dumped in his lap, but knew he had to tell Sheriff Kirkendall because the matter concerned public safety. He was concerned his motives would be suspected because of his uneasy relationship with Craven, that he might lose his job, and about the effect on morale in the jail. He decided to tell the Sheriff the next Monday, May 14.

In fact, Letts did call Craven on May 12 and told him Shepard was trying to get McKim to say things about him. Craven met with Letts and from talking to him understood that McKim had said he had let her run around on the train doing drugs, having sex, and later allowed her to party with undercover cops. Craven was upset and called Kirkendall, who asked if what McKim was saying was true. Craven answered it was not.

The Sheriff acted first on Monday. He paged Shepard to come talk to him. He asked Shepard what the deal was with McKim. Shepard testified he told Sheriff Kirkendall all that McKim had said. Kirkendall said he did not believe it, but Shepard said he did. Kirkendall told Shepard to drop the matter and Shepard said he would. Shepard testified he did not bring up the McKim matter again and dropped it as directed by the Sheriff.

As it turned out, part of McKim's story was true. Craven testified the railroad had no objection to prisoners being transported in cuffs and leg irons if they were in a sleeping compartment, but did not like them to be "bundled" if in a coach where they could be seen by other passengers.

Craven had had to get coach tickets for the three of them. He knew McKim and did not think she was a flight risk. He allowed her to be free of restraints during the trip. Both Craven and McKim were smokers and they went to the smoking car a few times. Craven allowed her to have cigarettes. The train was delayed in reaching Chicago and they missed their connection in Chicago, as McKim had said. Craven testified there was not enough time to book McKim into, and then out of a Chicago jail the next morning to catch the train to Ottumwa, booking procedures evidently taking somewhat longer in the Chicago area. The railroad gave them three hotel rooms and McKim was allowed to stay in a room by herself unsupervised. Craven said Leinhauser refused to stay with McKim, though in her testimony Leinhauser denied that was the case. Craven denied all of the alcohol and drug use aspects of McKim's story, and said that he had not consumed alcohol on the trip.

It is undisputed, as testified to in part by Sheriff Kirkendall and Craven, that if McKim's story was true Craven had arguably engaged in criminal conduct with respect to McKim's alleged use of alcohol and drugs, and at the least had violated various rules, policies and standards pertaining to the transportation and keeping of prisoners. Kirkendall testified specifically that he established the policies for the Sheriff's department and that allowing McKim to stay unsupervised in a hotel room and travel without restraints was a violation of his policies.

Kirkendall testified that Shepard refused to give him the source of his information (Mineart) other than McKim. Shepard testified Kirkendall did not ask him where he got the information, and said he knew where it came from. Apparently Shepard did identify Katie Leinhauser. Kirkendall testified he told Shepard the matter would be investigated. McKim's

story sounded ridiculous on its face. The only investigation he conducted, beyond Craven's denial, was to talk to Leinhauser who denied McKim's story. Kirkendall did not talk to McKim.

McKim was incarcerated again not long after speaking with Shepard. Craven was assigned the job of transporting her to a prison facility in June 2001. During the trip he engaged her in conversation about her contacts with Shepard and wrote a memorandum to Sheriff Kirkendall about what McKim told him. (Ex. J). McKim allegedly stated that when Shepard first came to her residence he had demanded she write a statement about the trip from Arizona, saying that if she did not he would talk to the county attorney to see that she received the maximum sentence on some pending charges when she went to court, but that if she cooperated, he would see to it that she did no prison time. McKim continued that subsequently, after he had spoken to the Sheriff, Shepard contacted her expressing the fear he would lose his job if she did not help him, presumably by writing the statement. As reported by Craven, McKim told Shepard nothing had happened on the trip and she was not going to assist him in getting Craven fired.

After receiving Craven's memorandum of his discussion with McKim, Sheriff Kirkendall decided to confront Shepard with, according to Kirkendall, a number of complaints about Shepard's conduct that had surfaced, including his involvement in the McKim matter. He did not contact

McKim to attempt to verify Craven's report. Nor did he verify the report with the female correctional officer who accompanied Craven during the June 2001 transport of McKim.

Shepard returned from a vacation in late June and was summoned to meet with Sheriff Kirkendall and deputy Mark Miller at the Sheriff's office on the evening of July 1. The versions of the meeting differ. Sheriff Kirkendall testified he intended to discuss several issues with Shepard, but had not decided to terminate him. According to Kirkendall, when Shepard responded to his various criticisms with expletive-laden tirades he told Shepard it would be best if he resigned and that if he did not he would be discharged. After another angry exchange Shepard wrote out his resignation.[2]

As the jury evidently accepted Shepard's version of the conversation, the Court must do so for purposes of the present motion.[3] Shepard testified that after a few pleasantries Kirkendall told him at the outset of the meeting that his services were no longer needed. Shepard said he asked for an explanation. Kirkendall gave him four. Kirkendall first mentioned the "McKim thing." He said Shepard should not have gotten involved in it and accused him of trying to coerce McKim. Kirkendall conceded he opened the discussion with the McKim matter and his belief the allegations were not true. Shepard testified he was shocked by the coercion accusation and vehemently denied it, using the "F" word.[4]

---

**2.** The parties agreed that in the circumstances Shepard's termination of employment was by discharge, not resignation.

**3.** Sheriff Kirkendall asked Miller to be present at the meeting to witness what transpired. He told Miller the meeting might lead to Shepard's termination. Miller did not perform his function very well. He testified he

did not pay complete attention and spent the time leafing through a magazine.

**4.** Shepard testified he did tell McKim he would write a reference letter for her noting her good behavior in jail, and said he had written many such letters for prisoners before. He did not write the letter because of the Sheriff's direction to drop his inquiry into the matter.

According to Shepard the next issue raised by Kirkendall was a complaint he had received about Shepard's demeanor in discussing the Sheriff's department with Supervisor Jerry Parker. Shepard testified he talked to Parker twice in April 2001 about the proposed budget for overtime hours in the Sheriff's department. Shepard did not believe enough money had been budgeted. Shepard testified Kirkendall told him he had been informed Shepard had "ranted and raved" in Parker's office. Shepard denied that he did so, though admits he may have been loud and animated. Parker testified Shepard had become animated, raised his voice and paced around the office. His voice was loud enough that Parker's secretary became concerned and mentioned it to him. Parker denied he complained about Shepard's conduct to Kirkendall. He did have a conversation with Kirkendall at some point in which he described what had transpired.

Shepard said that the third complaint raised by Kirkendall related to a conversation Shepard had had with Wapello County Auditor Phyllis Dean concerning the overtime on a correctional officer's time card. Kirkendall told Shepard that Dean had said Shepard was rude and profane in her office. Shepard denied having been rude and profane but said it was possible he may have been loud because he often talked loudly. Dean testified she told Shepard not to talk loudly with her clerks in the public area of her office about payroll issues, and asked him to step into the office to do so. The volume was apparently her chief objection. She said that the next time she saw Sheriff Kirkendall she asked him not to send Shepard to her office in the future.

Kirkendall's fourth and final complaint as testified to by Shepard had to do with directions Shepard allegedly had given to jail employees not to document inmate recreation. Iowa law requires that persons in jail be afforded a specified amount of recreation. The jail is inspected from time to time and maintained recreation logs as proof of compliance. Craven testified that in preparing for an upcoming jail inspection (apparently while Shepard was on vacation) he could not locate the recreation logs. When he asked Kevin Mineart about them Mineart told him Shepard said they did not have to keep the logs any longer. Craven complained to the Sheriff. Mineart testified that when the jail moved to the new facility recreation became a scheduled event, unlike in the old jail. Because a large number of inmates could recreate at the same time in the new jail, and availed themselves of the opportunity to varying extents, the jail stopped logging those inmates who opted not to use their recreation time. Mineart testified Craven made the change in the logging policy. When Kirkendall raised it with Shepard at the July 1 meeting Shepard told Kirkendall he did not know where he was coming from and he denied that he ever told the correctional officers not to document recreation.

As noted, whether Sheriff Kirkendall decided to terminate Shepard prior to the meeting, or only after Shepard's angry reaction to the issues Kirkendall discussed with him was a disputed issue. But viewing the evidence favorably to Shepard the jury could have found that Kirkendall had made up his mind to fire Shepard before the meeting and used the meeting to give Shepard his purported reasons for the discharge.

Additional facts are discussed below as they may be relevant to the issues presented.

### Qualified Immunity

■ Sheriff Kirkendall contends he is entitled to qualified immunity on Shepard's § 1983 First Amendment claim. If he is

entitled to qualified immunity the federal claim against the county also fails. *Turpin v. County of Rock*, 262 F.3d 779, 784 (8th Cir.2001). A state actor has qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Preliminarily, the Court notes that defendants make a point of stating that qualified immunity "ordinarily should be decided by the court long before trial." Def. Brief at 6 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)); *see Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). That is true. The reason the issue was not decided long before trial in this case was that defendants did not present it until their Rule 50(a) motions made during trial.[5]

When qualified immunity is raised after a trial in which the plaintiff has prevailed, the first question in the qualified immunity analysis is, examining the trial evidence in the light favorable to plaintiff, was the evidence "so one-sided that defendants were entitled to prevail as a matter of law" on the constitutional claim. *Hill v. McKinley*, 311 F.3d 899, 903 (8th Cir. 2002). Shepard alleged, and the jury evidently found, that motivating factors in Kirkendall's decision to discharge him were his statements to Sheriff Kirkendall concerning Craven's alleged misconduct in connection with the McKim transport in response to Kirkendall's questions and to Supervisor Parker regarding the budget

for overtime hours. *See* Inst. No. 14. The jury answered "no" to the question "[w]ould Kevin Shepard have been discharged from employment regardless of the statements he contends were protected by his constitutional right of free speech?"[6] Defendants argued at trial that insofar as the McKim matter was involved, Shepard was discharged because he had disobeyed the Sheriff's instruction not to pursue the McKim matter further. Additionally, they claim he was insubordinate in addressing the Sheriff at the July 1, 2001 meeting, had become a disruptive influence within the Sheriff's department as shown by the fractious relationship with Craven, and had been rude and disruptive in his dealings with Supervisor Parker and Auditor Dean. There was abundant evidence from which the jury could have found Shepard was discharged for these reasons and not for the alleged protected speech activity. But it was not bound to so find. It did not have to credit the Sheriff's explanation for Shepard's discharge.

The beginning point when it is claimed the evidence of motive is insufficient is recognition that it is difficult to take the case from the jury when a party's motive and intent are in issue. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir.) (Heaney, J., dissenting and citing cases), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). When he first heard the allegations against Craven, Kirkendall considered them to be ridiculous. The jury may have found that Kirkendall's rejection of the McKim allegations

---

**5.** The qualified immunity defense was not raised in defendants' summary judgment motion denied by Chief Judge Longstaff on March 4, 2003.

**6.** Defendants argue that the jury should not have been allowed to second guess the Sheriff's motivation, but motivation, including

whether the plaintiff would have been discharged regardless of the protected speech, are essential facts for the jury to determine in a First Amendment retaliatory discharge case. *See Shands v. City of Kennett*, 993 F.2d 1337, 1343 (8th Cir.1993), *cert. denied*, 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994).

out of hand betrayed a sense of anger about them and explains why Kirkendall did not conduct any real investigation, despite his statement to Shepard that he would do so. That the first issue raised by Kirkendall in the July 1 meeting was the McKim matter might reasonably have indicated to the jury that was the paramount reason for Shepard's discharge. A number of other factors may have led the jury to doubt the reasons given by defendants for Shepard's discharge and to conclude instead the content of Shepard's speech in reporting the original McKim allegations motivated the discharge decision. Kirkendall initially emphasized at the meeting his belief McKim's allegations were untrue, not Shepard's failure to follow his instruction to drop the matter. The jury could have taken this as implicit criticism for bringing the allegations forward. From Kirkendall's acceptance at face value of Craven's report of his conversation with McKim about Shepard's alleged conniving (when he had earlier discounted her credibility and could have verified Craven's report with another officer), his apparent tolerance of Craven's poor job performance (according to Shepard), and close relationship with Craven (according to Mineart) may have caused the jury to conclude the Sheriff acted out of a desire to protect Craven.

The jurors could reasonably have viewed the issues raised by Kirkendall in the July 1 meeting as make-weights. Shepard's demonstrative, loud nature was well known and he had not previously been told his employment was at risk if he did not change. The events involving Parker occurred three months before the discharge. When the incident with Dean occurred is not clear, but the jury may have inferred from the testimony that it was stale as a basis for disciplinary action. Kirkendall also appears to have accepted Craven's complaint about the logs without checking. Given Craven's hostility to Shepard and

evident motive, the jury could have considered that if this was grounds for discharge one in Kirkendall's position would talk to the jail staff to sort out what had happened and who was responsible. Had he done so, Kirkendall would have learned the information was untrue.

With respect to Shepard's complaint to Parker about the budget, defendants' principal argument is that there was no evidence Parker mentioned the substance of his discussion with Shepard to Kirkendall when Parker told Kirkendall about Shepard's demeanor. They point out that Kirkendall testified he did not know about the substance of the conversation until trial. Here again, the jury was not required to accept the testimony of Parker and Kirkendall. *See Willis v. State Farm Fire & Cas. Co.*, 219 F.3d 715, 720 (8th Cir.2000). The jury may have considered it improbable that in informing the Sheriff about Shepard's demeanor Parker did not tell the Sheriff what it was Shepard was excited about. Kirkendall testified he was aware that Shepard had discussed budget issues with Parker. The jury may also have considered that even if Parker did not tell Kirkendall directly, Kirkendall would have surmised that the overtime budget was the source of Shepard's irritation. That the content of Shepard's speech, not his demeanor, led Kirkendall to include the Parker episode in his list of reasons why Shepard was discharged was a conclusion the jury may have reached from Parker's testimony in which he minimized the significance of Shepard's demeanor and said he had not complained about it.

What the jury's actual thought process was in assessing the evidence is unknowable, but the evidence was not so one-sided that no reasonable interpretation of it could support the conclusion that the al-

leged protected statements were a motivating factor for Shepard's discharge.

Sufficiency of the evidence on cause in fact is, however, not enough. Qualified immunity incorporates an additional two-step inquiry to be made when a public employee claims a discharge resulting from the employee's speech violates the First Amendment. *See Shands,* 993 F.2d at 1342.

> ... First, we determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146[, 103 S.Ct. 1684, 75 L.Ed.2d 708] ... (1983); *Shands,* 993 F.2d at 1342. Second, if the speech addresses a matter of public concern, we balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568[, 88 S.Ct. 1731, 20 L.Ed.2d 811] ... (1968); *Shands,* 993 F.2d at 1342. Both inquiries are questions of law for the court to decide. *See Connick,* 461 U.S. at 148 n. 7, 150 n. 10[, 103 S.Ct. 1684] ...; *Shands,* 993 F.2d at 1342.

*Allen v. City of Pocahontas,* 340 F.3d 551, 556 (8th Cir.2003) (quoting *Belk v. City of Eldon,* 228 F.3d 872, 878 (8th Cir.2000), *cert. denied,* 532 U.S. 1008, 121 S.Ct. 1734, 149 L.Ed.2d 659 (2001)). From the leading Supreme Court cases this is known as the *"Connick–Pickering* analysis." *Allen,* 340 F.3d at 556.

In denying defendants' motion for summary judgment Chief Judge Longstaff concluded as a matter of law that Shepard's statements to Sheriff Kirkendall regarding the alleged misconduct of Craven and complaints to Parker about the budget for overtime hours constituted speech on matters of public concern. March 4, 2003 Order at 11. Defendants do not contend otherwise except with respect to the allegations of marijuana and cocaine use by McKim.[7] They acknowledge these would address a matter of public concern if reasonable, but argue not in this case because the allegations were outlandish and, they suggest, fabricated by Shepard. The jury obviously did not believe Shepard had made up the allegations. That Judson Letts talked with McKim and told Craven what McKim said she had told Shepard is against a finding that Shepard made the story up. Shepard was not reporting McKim's allegations as a fact. In answer to the Sheriff's questions Shepard told the Sheriff what McKim had said. That the allegations seemed incredible to the Sheriff does not take them outside the realm of public concern. Serious allegations of misconduct by a public official in the performance of his duties clearly involve a matter of public concern. *See infra* at 1016. The nature of the allegations is more appropriately considered a part of the *Pickering* balancing test discussed next.

The main focus of defendants' qualified immunity argument is on the *Pickering* balancing test. The balance between an employee's right to speak on matters of public concern and the employer's interest in promoting efficiency involves consideration of six relevant factors:

> (1) the need for harmony in the office; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of

---

**7.** Defendants make the same argument with respect to the report that McKim was allowed to engage in sexual activity. The Court's recollection is that any reported information about sexual activity by McKim on the trip came from Judson Letts' statements to Craven, not Shepard.

the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Hall v. Missouri Highway & Transp. Comm'n,* 235 F.3d 1065, 1068 (8th Cir. 2000). Defendants' focus on *Pickering* is understandable because the Eighth Circuit has observed that "when *Pickering*'s fact-intensive balancing test is at issue, the asserted First Amendment right 'can rarely be considered "clearly established" for purposes of the *Harlow* qualified immunity standard.'" *Buzek v. County of Saunders,* 972 F.2d 992, 996 (8th Cir.1992) (quoting *Bartlett v. Fisher,* 972 F.2d 911, 916 (8th Cir.1992)); *see Kincade v. City of Blue Springs, Mo.,* 64 F.3d 389, 398 (8th Cir. 1995), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996). The court has, nonetheless, in recent years rejected qualified immunity arguments after applying the *Pickering* test. *See Meyers v. Nebraska Health and Human Services,* 324 F.3d 655, 659 (8th Cir.2003); *Hall,* 235 F.3d at 1068.

The difficulty with defendants' reliance on *Pickering* is their theory of the case. The *Pickering* test is applicable "only if it is first established that *the speech in question created a disruption in the workplace.*" *Washington v. Normandy Fire Protection Dist.,* 272 F.3d 522, 526 (8th Cir.2001) (emphasis added); *see Gordon v. City of Kansas City, Mo.,* 241 F.3d 997, 1003 (8th Cir.2001). It is not enough for the employer to merely assert that alleged protected speech is disruptive, the employer must come forward with specific evidence that the speech substantially dis-

rupted the work environment. *Washington,* 272 F.3d at 526–27; *Grantham v. Trickey,* 21 F.3d 289, 295 n. 4 (8th Cir. 1994); *see Kincade,* 64 F.3d at 398. Defendants denied the alleged protected speech was a factor in Shepard's discharge and consequently did not claim or produce evidence that the alleged protected speech itself disrupted the work environment. Indeed as noted, with respect to the Parker episode they contended the Sheriff was not aware of the speech. At the outset *Pickering* has doubtful applicability in the circumstances of this case.

Though defendants did not argue any disruption caused by Shepard's speech informing Kirkendall of the reported allegations made by McKim was a cause for discharge, there certainly was evidence that the allegations upset Craven and caused further deterioration in the relationship between Craven and Shepard. Craven, however, learned of the allegations not from what Shepard told the Sheriff but from what Judson Letts told him McKim had said. Shepard made his statements about the McKim allegations in a private conversation with the Sheriff. If Shepard is believed, after Kirkendall told him to drop the matter he did so. "[A] purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee." *Rankin v. McPherson,* 483 U.S. 378, 388 n. 13, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Moreover, the jury specifically found Shepard's statements about the McKim matter were not disruptive.[8]

To the extent there is any need to consider the *Pickering* test further, Kirken-

---

8. The Court submitted two factual issues to the jury to assist in determining whether Shepard's speech concerning the McKim matter and the budget was protected. *See Shands,* 993 F.2d at 1342. In special interrogatories the jury was asked if Shepard's statements, or his conduct in making them,

caused, or could have caused, disharmony or disruption in the workplace. In both instances the jury answered "no." The jury was asked if the statements impaired Shepard's ability to perform his duties, and again in both instances the jury answered "no." Verdict Question Nos. 6a, 6b.

dall is still not entitled to qualified immunity. There is of course a need for harmony in relationships between jail workers charged with the safekeeping of prisoners. There should have been a close working relationship between Craven and Shepard. However, all of the other relevant factors are against a finding of qualified immunity. The speech concerning McKim was made to Kirkendall in private in response to his questions. He did not spread the allegations around within the office. The context was appropriate. There is a strong public interest in protecting speech which alleges illegality and misconduct by public officials. Such speech "occupies the 'highest rung of First Amendment hierarchy.'" *Hall*, 235 F.3d at 1068 (quoting *Sexton v. Martin*, 210 F.3d 905, 913 (8th Cir.2000)). There is no evidence Shepard's report of the information concerning McKim affected his ability to perform his duties. This is one of those cases in which a state actor in Kirkendall's position could not have felt justified in discharging Shepard because of what Shepard told him McKim had said.

The remaining question under the qualified immunity analysis is whether the First Amendment right violated was clearly established at the time Shepard was discharged. "The law is clearly established if the law was sufficiently developed to give the official 'fair warning' that his alleged conduct violated the plaintiff's rights." *Shade v. City of Farmington*, 309 F.3d 1054, 1057–58 (8th Cir.2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). There is no question on this issue. Over thirty years ago, in *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the U.S. Supreme Court said its holdings made it clear that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." Citing *Perry*, the court in *Rankin, supra*, believed it to be "clearly

established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." 483 U.S. at 383, 107 S.Ct. 2891. Citing *Rankin*, our court of appeals in 1993 opined that "[n]o right is more clearly established in our republic than freedom of speech," and "a State may not discharge an employee on a basis that infringes" that right. *Casey v. City of Cabool*, 12 F.3d 799, 804 (8th Cir. 1993), *cert. denied*, 513 U.S. 932, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994). These sentiments were repeated by the court in *Hafley v. Lohman*, 90 F.3d 264, 267 (8th Cir. 1996), *cert. denied*, 519 U.S. 1149, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997) (retaliatory discharge is a clearly established First Amendment violation) and, less than a year before Shepard's discharge, in *Belk*, 228 F.3d at 882, and *Hall*, 235 F.3d at 1068. At the time Sheriff Kirkendall discharged Shepard the applicable law was very well developed and gave one in Kirkendall's position "fair warning" that discharging Shepard because he reported Craven's alleged misconduct and complained to a County Supervisor that the Sheriff's budget was inadequate would violate Shepard's rights under the First Amendment. *Hope*, 536 U.S. at 739, 122 S.Ct. 2508.

Defendants have not established the defense of qualified immunity.

### The County's § 1983 Liability

The County does not have § 1983 liability for the constitutional torts of its employees under a theory of respondeat superior. *Monell v. New York Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality can be held liable under the statute only if the municipality's custom or policy caused the deprivation of constitutional rights. *Id.* at 690–91, 98 S.Ct. 2018. "An unconstitutional governmental policy can

be inferred from a single decision taken by the highest official responsible for setting policy in that area of the government's business." *Angarita v. St. Louis County,* 981 F.2d 1537, 1546 (8th Cir.1992) (citing *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Whether an official has final policy-making authority is a question of state law and is to be resolved by the trial judge before the case is submitted to the jury. *Jett v. Dallas Ind. School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (citing *St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292). The Court determined Sheriff Kirkendall had final policy authority with respect to the decision to discharge Shepard and the jury, answering a special interrogatory, found that the Sheriff's decision was the result of a deliberate choice to follow a course of action from among various alternatives. Verdict Question No. 5.

■ In support of their JAML motion defendants argue the final policy-making authority with respect to employment policies resided in the County board of supervisors. First, defendants contend the fact Iowa law provides that the Sheriff, and other elected county officials, may appoint one or more deputies, assistants or clerks "with the approval of the board [of supervisors]" is evidence the board has the ultimate authority for employment decisions. Iowa Code § 331.903(1). Second, they rely on the fact the Wapello County supervisors have issued an employee handbook generally applicable to all county employees as evidence of their authority. (Ex. 2).

The Iowa Code includes among the general powers of a county sheriff the power to "appoint and remove deputies, assistants and clerks." Iowa Code § 331.652(7). This power is subject to the requirements of Iowa Code § 331.903 which does make the appointment of the deputies, assistants and clerks of county officers (of which the Sheriff is one) subject to the approval of the board. *Id.* subsec. (1). However, § 903 does not make the discharge of such employees subject to approval by the board. In fact, the authority to revoke appointments is given to the county officers. Iowa Code § 903(2).

The board of supervisors adopted an employee handbook facially applicable to all County employees. But Sheriff Kirkendall promulgated comprehensive written policies governing employees of his department. These included policies forbidding sexual harassment and establishing a process for sexual harassment complaints, policies governing the employment and retention of sheriff's department employees, and policies pertaining to disciplinary practices and procedures including, specifically, discharge. The disciplinary policies set out a comprehensive list of infractions and penalties. (Ex. 3).

At trial Supervisor Parker testified that the board establishes general policies for the County and approves the sheriff's budget, but does not have authority to set policies for the sheriff's department and was not directly involved in hiring and firing sheriff's department employees. He further testified that the individual elected officials of the County make the policy decisions within their respective departments. Sheriff Kirkendall testified that he established all of the policies and procedures for his department. He did not seek the approval of the board to discharge Shepard. It is a fair inference from the record that the board of supervisors did not exercise final authority with respect to policies pertaining to the discharge of Sheriff's department employees and left that area entirely up to the Sheriff.

The Sheriff's statutory authority over the removal of sheriff's department em-

ployees, the comprehensive policies adopted by Sheriff Kirkendall with respect to the retention, discipline and discharge of employees of his department, and the testimony of Supervisor Parker and Sheriff Kirkendall establish that the Sheriff was the final policy maker for his department with respect to the discharge of employees. Consequently the retaliatory discharge in violation of Shepard's rights under the First Amendment was, in light of the jury's answer to the special interrogatory, the policy of Wapello County subjecting it to § 1983 liability for the decision. *See e.g. Angarita,* 981 F.2d at 1546–47 (superintendent of police had final policy making authority for county police department); *Buzek,* 972 F.2d at 996 (sheriff with exclusive authority to fire deputy had sufficient policy making authority for county to have § 1983 liability).

### The § 1983 Claim Based on Shepard's Statements to Parker about the Budget

As a separate ground for JAML on the § 1983 claim, defendants argue there was no evidence that Sheriff Kirkendall was aware of the substance of Shepard's statements to Parker about the inadequacy of the proposed budget for overtime and, accordingly, there was no basis for the jury to conclude that Shepard's speech in this regard was a motivating factor in his discharge. As noted previously, the sufficiency of the evidence in this regard is part of the analysis of defendants' post-trial qualified immunity claim. As discussed *supra* at 1013, the jury was not required to believe the testimony of Parker and Kirkendall on the subject, and could have reasonably inferred from the circumstances that in fact Sheriff Kirkendall was aware of Shepard's complaints to Parker about the budget.

As between the two instances of claimed protected speech, the statements to Parker were the more doubtful as a basis for the First Amendment claim. Though the

Court believes the evidence was minimally sufficient to submit this part of the claim, even if it was not, defendants are not entitled to judgment as a matter of law or new trial on the § 1983 claim. The Parker statements were at issue only as an additional basis for the First Amendment claim. They were not involved in the state law claims. The fact Shepard recovered on the state law claims based solely on having been fired for voicing the McKim allegations indicates the jury must also have found liability against defendants on the federal claim based on the McKim statements. Thus, elimination of the Parker statements as a basis for liability on the federal claim would not have changed the outcome.

### The "Whistleblower Statute"

 Section 70A.29(1) of the Iowa Code prohibits a person from discharging a public employee as a reprisal for disclosing information to a public official which the employee reasonably believes is evidence of "a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." The jury found against Sheriff Kirkendall on the whistleblower claim. In support of his JAML motion on the claim, Kirkendall makes a brief, conclusory argument that the claim "simply is not true." Def. Brief at 11. He contends the evidence established conclusively that Shepard was fired because of inter-office friction that led to a division in the department. For reasons stated previously in connection with the discussions of defendants' qualified immunity defense, the evidence was sufficient for the jury to reasonably conclude that Shepard was discharged because of the information he provided to Sheriff Kirkendall about Craven's alleged misconduct in transporting Patricia McKim. As stated several times now, the jury was not re-

quired to accept the Sheriff's explanation for the discharge.

Beyond arguing the cause in fact for Shepard's discharge, Kirkendall advances no other basis for JAML on the whistle-blower claim and, accordingly, it is not necessary to consider the sufficiency of the evidence further with respect to the elements of the claim.

For the reasons stated above, defendants' motion for judgment as a matter of law will be **denied**.[9]

## III.

## MOTION FOR NEW TRIAL

### Weight of the Evidence

■ Defendants move for new trial on the basis that the verdict is against the weight of the evidence. That a verdict is against the weight of the evidence is a recognized ground under Fed.R.Civ.P. 59(a) on which to grant a new trial. "A new trial is appropriate if the verdict is against the weight of the evidence and if allowing it to stand would result in a miscarriage of justice." *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1160 (8th Cir. 1999); *see Adzick v. UNUM Life Ins. Co.*, 351 F.3d 883, 886 (8th Cir.2003); *Dominium Mgt. Services, Inc. v. Nationwide Hous. Group*, 195 F.3d 358, 366 (8th Cir. 1999); *Shaffer v. Wilkes*, 65 F.3d 115, 117 (8th Cir.1995).

> In determining whether a verdict is against the weight of the evidence, the trial court can rely on its reading of the evidence—it can "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."

*White v. Pence*, 961 F.2d 776, 780 (8th Cir.1992) (quoting *Ryan v. McDonough*

*Power Equip., Inc.*, 734 F.2d 385, 387 (8th Cir.1984)); *see United States v. Nambo-Barajas*, 338 F.3d 956, 961 (8th Cir.2003); *United States v. Huerta–Orozco*, 272 F.3d 561, 566 (8th Cir.2001). The Court may not, however, grant a new trial merely because the jury could have reached a different conclusion or because the Court feels another result could have been more reasonable. *White*, 961 F.2d at 780 (citing *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 186 (8th Cir.1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973)). Where reasonable minds can differ in assessing credible evidence, new trial should not be granted. *White*, 961 F.2d at 781. Thus, when the jury is presented with a choice between two stories, and reasonable jurors can differ in evaluating credible evidence, the jury's determination should not be disturbed. *Huerta–Orozco*, 272 F.3d at 566.

■ In weighing the evidence the Court is drawn to a third explanation for Shepard's discharge which reflects the view that the evidence offered by neither side was completely credible. It is likely Sheriff Kirkendall made up his mind to fire Shepard before the July 1 meeting. The Court is inclined to believe the Sheriff's description of Shepard's expletive-laden, hostile reaction to the various complaints about Shepard's conduct the Sheriff attempted to raise. The Sheriff's testimony in this regard would be consistent with Shepard's character as shown by other evidence in the case. But neither that or the other specific reasons given by defendants for Shepard's discharge were the real reasons that motivated Kirkendall.

Craven and Shepard were the two top officers in the jail. Shepard did not think

---

9. In their motion papers defendants do not expressly put forward any basis for judgment as a matter of law on Shepard's claim that the County wrongfully discharged him in viola-

tion of Iowa public policy. Accordingly, the verdict and judgment in plaintiff's favor on that claim has not been discussed.

Craven was pulling his weight and wanted his job. Craven believed Shepard was out to get him. Each attempted to dirty the other in the eyes of Sheriff Kirkendall. The Sheriff was in the middle of a fractious situation. The McKim matter made the situation much worse. When Craven reported that McKim had told him Shepard had been in contact with her trying to get a written statement backing up the allegations after the Sheriff had told Shepard to drop the matter, the Sheriff was presented both with an opportunity and proof that the problem was not going to go away. Craven or Shepard had to go. It was not a difficult choice. The Sheriff did not want to reward Shepard and he had a closer, more agreeable relationship with Craven.

Whether Shepard had actually gone to McKim as Craven claimed was not important, hence the Sheriff did not bother to talk to McKim or the officer who had been with Craven and McKim at the time. The other grievances the Sheriff gathered to confront Shepard with were intended to give a patina of legitimacy to a decision already made. They would not have warranted discharge. When Shepard walked into the Sheriff's office on July 1 his fate was sealed. His profane, confrontational reaction to the issues Kirkendall attempted to discuss with him may have confirmed to Kirkendall the wisdom of his decision. If the facts are viewed in this light none of Shepard's claims would have merit. Shepard was fired because he and Craven could not get along.

That a reasonable interpretation of the credible evidence supports this view of events does not mean that the jury's verdict to the contrary was so far out of bounds as to constitute a miscarriage of justice. The subject matter of this lawsuit was simple, ultimately boiling down to the key factual question: why was Shepard fired? Was Sheriff Kirkendall motivated by Shepard's report of the alleged misconduct of Craven in transporting McKim and his criticisms of the Sheriff's proposed budget? Was it for the reasons given by the defendants? Or was it simply to resolve the acrimonious situation that had developed between Craven and Shepard? The evidence bearing on the issue of motive was not complicated and was of the sort juries are called upon every day to assess by bringing their common sense, life experiences and judgments about human nature to the jury room. The case law counsels the Court should be reluctant to grant a new trial in cases of this kind. *White*, 961 F.2d at 781 (quoting *Fireman's Fund*, 466 F.2d at 187); *see* 11 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 2806, at 73 ("Wright & Miller"); 12 *Moore's Federal Practice 3d* § 59.13[2][f] at 59–72. As the preceding discussion demonstrates, determining the ultimate issue in this case is all about assessing the credibility of the witnesses and drawing inferences from the evidence found more believable. Reasonable minds can differ about the result reached from this process. This is a case in which, despite some misgivings, it is appropriate to accept the jury's findings on the issue of liability. Wright, Miller & Kane § 2806 at 74.

### Emotional Distress Damages

■ The jury awarded a total of $250,000 for mental or emotional pain and suffering, $200,000 for past suffering and $50,000 for future suffering. Defendants argue that these amounts are excessive and not supported by the evidence.

A verdict may be disturbed because it is excessive "only when the verdict is so grossly excessive as to shock the conscience of the court." *Eich*, 350 F.3d at 763 (quoting *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir.1983)); *see Foster v. Time Warner Entertainment*

*Co., LP,* 250 F.3d 1189, 1196 (8th Cir. 2001); *Thorne v. Welk Inv. Inc.,* 197 F.3d 1205, 1211 (8th Cir.1999). "[A]wards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." *Eich,* 350 F.3d at 763 (quoting *Frazier v. Iowa Beef Processors, Inc.,* 200 F.3d 1190, 1193 (8th Cir.2000)). The jury's discretion, however, is not boundless and is limited to a reasonable range supported by the evidence. If the verdict is substantially above that range the conscience of the Court becomes involved.

Two of the causes of action on which Shepard recovered are governed by Iowa law. It is therefore appropriate to consider the alleged excessiveness of the verdict under the relevant Iowa authorities as well. *See Johnson v. Cowell Steel Structures, Inc.,* 991 F.2d 474, 477 (8th Cir. 1993). The governing standards are well-established in Iowa case law and are not as a practical matter materially different from the federal standard.

> ... The real question in most cases ... is the amount and sufficiency of the evidence to support the award made. Certainly where the verdict is within a reasonable range as indicated by the evidence the courts should not interfere with what is primarily a jury question.
> ....
> ... The determinative question posed is whether under the record, giving the jury its right to accept or reject whatever portions of the conflicting evidence it chose, the verdict effects substantial justice between the parties.

*Kautman v. Mar–Mac Comm. School Dist.,* 255 N.W.2d 146, 147–48 (Iowa 1977) (quoting in part *Mazur v. Grantham,* 255 Iowa 1292, 1303, 125 N.W.2d 807, 814 (1964)); *see Penney v. Praxair, Inc.,* 116 F.3d 330, 333 (8th Cir.1997) (applying Iowa law); *Johnson v. Knoxville Comm. Sch. Dist.,* 570 N.W.2d 633, 641–42 (Iowa 1997); *Cowan v. Flannery,* 461 N.W.2d 155, 157–58 (Iowa 1990); *Blume v. Auer,* 576 N.W.2d 122, 126 (Iowa.App.1997). Iowa courts, like federal courts, recognize that non-economic elements of a damage award such as emotional distress damages are particularly within the province of the jury. *Foggia v. Des Moines Bowl–O–Mat, Inc.,* 543 N.W.2d 889, 891–92 (Iowa 1996); *Matthess v. State Farm Mut. Auto. Ins. Co.,* 521 N.W.2d 699, 704 (Iowa 1994).

Emotional distress damages must be supported by evidence of "genuine injury." *Forshee v. Waterloo Indus. Inc.,* 178 F.3d 527, 531 (8th Cir.1999) (quoting *Carey v. Piphus,* 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). Expert medical testimony is not required. The testimony of the plaintiff, members of his family and those who observed him may suffice. *Forshee,* 178 F.3d at 531; *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1065 (8th Cir.1997).

Shepard produced sufficient evidence of a genuine emotional injury. The evidence came from his testimony and that of his wife, Jane Shepard. Shepard testified that after he was fired it felt as if "my whole life had just ended." He became emotional on the witness stand. He testified he has been unable to find subsequent employment despite many applications. This has hurt his self-esteem and diminished his self-confidence. Shepard testified he has questioned whether he is a good husband and father. He was raised in a family with a father who had a strong work ethic. Now he has become a stay-at-home father and this has caused him to put himself down. The loss of his job, and inability to replace it, has affected his sleep and his relationship with his wife. They do not talk as much as they used to and are not as close. The economic effects

have added to the stress. He could not afford COBRA insurance and it bothers him that he does not have the money he once had to spend on his children.

Shepard testified he has received some counseling from his pastor, but he has not been medically treated.

Mrs. Shepard described her husband as confused and sobbing after he came home from the July 1 meeting. She further testified that her husband is still affected by the discharge and has not made sense of it yet. The many rejection letters he has received from his applications for other employment have made him feel like a failure. As a result, where he was self-confident before and had a great deal of self-esteem, he now does not feel worthy. Mrs. Shepard echoed her husband's testimony that his ill feelings about himself have caused a strain in the marriage.

It is appropriate to recognize, as Shepard points out that he liked his job, thought he was doing it well, was self-confident and had a positive image of himself. Viewing the evidence favorably to Shepard, the jury could reasonably have concluded that the sudden loss of his job took a toll emotionally which has persisted. The jury could therefore reasonably return a substantial verdict for emotional distress damages, but not $250,000. In the Court's judgment the verdict in this regard is grossly excessive and lacking in evidential support to an extent that it shocks the conscience of the Court as that concept has been applied in the case law.

The case law does not provide any fixed parameters for emotional distress awards in employment cases, but it is useful in assaying the broad outlines of the boundary between what is excessive and what is not. Most recently, in *Eich* the Eighth Circuit restored a $200,000 emotional distress award in a Title VII hostile work environment and retaliation case which the trial court had found excessive. In doing so it surveyed a number of Eighth Circuit employment cases in which emotional distress damage awards had survived excessiveness arguments. 350 F.3d at 763. The largest cited by the *Eich* court was a $165,000 emotional distress award upheld in *Mathieu v. Gopher News Co.*, 273 F.3d 769 (8th Cir.2001). *Mathieu* involved an ADA plaintiff whose employment was terminated. In some respects *Mathieu* is similar to this case. Mathieu had not received treatment for mental anguish and relied on his own testimony. Mathieu's standard of living was reduced and he said he had become depressed. *Id.* at 783. In addition to being discriminated against, Mathieu was terminated after having worked for his employer for thirty-four years, the last sixteen as a manager. *Id.* at 774, 783. Shepard had worked for Wapello County less than four years at the time of his discharge.

The plaintiff in *Ross v. Douglas Co., Neb.*, 234 F.3d 391 (8th Cir.2000), recovered $100,000 for emotional distress after he prevailed on claims of racial discrimination involving disparate treatment, retaliation, and hostile work environment involving racial slurs which led to the loss of his job. *Id.* at 396–97. The Eighth Circuit affirmed the damage award because, in addition to financial distress, Ross sustained both emotional and physical injury. *Id.* at 397.

In *Kucia v. SE Ark. Community Action Corp.*, 284 F.3d 944 (8th Cir.2002), the court found that an excessiveness argument concerning a $50,000 emotional distress award for a racially discriminatory termination of employment presented a "close" question. *Id.* at 948. The plaintiff's testimony was the only evidence of emotional distress offered at trial and shared some similarities with this case. Kucia had testified, in substance, that her self-esteem had suffered, that she had be-

come unpleasant, had lost sleep, and her relationship with her husband had been affected. *Id.* at 947.

*Foster, supra,* involved a plaintiff who had been terminated for opposing discrimination unlawful under the ADA. 250 F.3d at 1192. The jury awarded $75,000 for compensatory damages, apparently emotional distress. Similar to Shepard's testimony, Foster had testified she was devastated by the termination, had been withdrawn, and feared she would not be able to find another job. The court held the $75,000 award was not so excessive as to shock the conscience. *Id.* at 1196.

The plaintiff in *Frazier, supra,* recovered $40,000 for emotional distress damages on a claim of retaliatory discharge in violation of public policy, one of the causes of action on which Shepard prevailed in this case. 200 F.3d at 1192. The Eighth Circuit held that "[w]hile the $40,000 verdict appears to be generous, we do not feel that it was excessive." *Id.* at 1193. Like Shepard, Frazier had testified that he felt his dignity and self-esteem had been taken away when he was terminated, that he felt empty and was lost. His ex-wife testified he appeared to be a "broken man." *Id.*

As noted the *Eich* court upheld a $200,000 emotional distress verdict. The damages were returned on Eich's hostile work environment sexual harassment claim. The facts in Eich illustrate the type of employment claim which might support an emotional distress award in the range Shepard received. Eich had been subjected to "sexual touching and sexual innuendos made in [her] presence over a continuous period of time." 350 F.3d at 759. She had reported the harassment to her superiors to no avail. *Id.* She described how demeaned and humiliated she felt as a result of the harassment she had to endure.

A case not cited by the *Eich* court also serves to illustrate the type of egregious

conduct which justifies a large emotional distress award. The plaintiff in *Madison v. IBP, Inc.,* 257 F.3d 780 (8th Cir.2001), *cert. granted, judgment vacated on other grounds,* 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002), obtained a verdict including an award of $266,750 for emotional distress damages for sex and race discrimination and harassment. The court concluded it was not excessive. It noted that the plaintiff had endured harassment and discrimination going back to 1993. She had been "subjected to egregious and humiliating conduct which wreaked havoc on her emotional health and caused her great anguish which manifested itself physically." *Id.* at 802. The court distinguished *Delph v. Dr. Pepper Bottling Co. of Paragould,* 130 F.3d 349 (8th Cir.1997), which reduced a bench trial emotional distress award from $150,000 to $50,000 because Madison was "subjected to a more severe and continuous pattern of harassment." 257 F.3d at 803.

*Delph* was a racially hostile work environment and constructive discharge case. The trial court had awarded $150,000 in compensatory damages, apparently for emotional distress. Delph had testified he was "emotionally hurt" and had experienced ulcer-like symptoms. Delph's wife testified he was withdrawn and "upset a lot of the time." 130 F.3d at 357. The court held that "the testimony of Delph and his wife does not describe the severe emotional distress that would warrant such a large award of damages" and reduced the award to $50,000. *Id.* at 357–58.

One additional case bears mention. *Forshee, supra,* was a "quid pro quo sexual harassment" case in which the employee had been terminated when she refused her supervisor's sexual advances. 178 F.3d at 529. The jury returned an approximately $10,000 award for emotional distress damages. The court held the evidence was

insufficient to submit the issue. The claim was based entirely on Forshee's testimony in which she had said after her termination she went home and cried the rest of the day, and was forced to take a job at lower pay. The court observed that Forshee "did not identify and describe the type of severe emotional distress that warranted the awards in cases such as [*Delph* ]." *Id.* at 531.

Two points emerge from this body of case law. First, a $250,000 award for emotional distress damages from an unlawful termination of employment is very large, sustainable only upon a showing of a severe degree of emotional distress. Second, typically an award of that magnitude is supported by evidence that the emotional injury was unusually severe because of the egregious or continuing nature of the injurious conduct, the particular circumstances of the plaintiff, or both.

Shepard's emotional distress resulted from a single incident of injurious conduct. He was fired. His discharge was not the culmination of an egregious course of conduct which exacerbated the emotional injury. The anger, confusion, loss of esteem, financial worry, and effect on marital relationships he and Mrs. Shepard testified to are common consequences of an involuntary loss of employment as the cases described above illustrate. Shepard did not treat with a doctor or mental health care provider. He talked to a pastor, but that individual did not testify. Overall, the evidence pertaining to emotional distress damages in this case is far short of supporting the exceptional verdict returned by the jury.

Because the jury's awards for emotional distress damages are excessive defendants are entitled to a new trial. The Court does not believe the jury's liability findings were affected by evidence of damages and the two issues are not intertwined.[10] Accordingly, new trial is appropriate only on the issue of damages. *See Ryko Mfg. Co. v. Eden Services,* 823 F.2d 1215, 1239–40 (8th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988); *see also Madison v. IBP, Inc.,* 330 F.3d 1051, 1060–61 (8th Cir.2003) (new trial ordered on punitive damages only following remand from Supreme Court for further consideration of effect of federal limitations period). The new trial should be as to all damage items."Jury determinations of damages are apt to be influenced by the recovery allowed for other elements of damage." *Brant v. Bockholt,* 532 N.W.2d 801, 805 (Iowa 1995). In employment cases the economic and non-economic items of damage are often related. The economic impact of a loss of employment may be a source of mental anguish, embarrassment or loss of enjoyment of life.

The Court may conditionally grant a motion for new trial but allow plaintiff to avoid a new trial if plaintiff agrees to remit an amount of damages as determined by the Court. *See Hetzel v. Prince William County, Va.,* 523 U.S. 208, 211, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998); *Donovan v. Penn Shipping Co.,* 429 U.S. 648, 648–49, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977); *Thorne,* 197 F.3d at 1212. It is appropriate to permit plaintiff an opportunity to consent to a remittitur in this case. In fixing the remittitur amount, due regard for the Seventh Amendment right to jury

---

**10.** If the amount of emotional distress damages was excessive to the point the Court could infer that passion or prejudice were at work against defendants new trial of all issues would be the only appropriate remedy. In the Court's judgment the verdict does not support such an inference. There is no "ex-

act or mathematical standard" for the determination of emotional distress damages. Inst. No. 20. Only a clearly punitive award of such damages to an extent not present here would support a conclusion that the jury violated the instructions and their oath by letting improper influences guide them.

trial requires that "remittitur to the maximum amount proved" be the standard. *In re Knickerbocker*, 827 F.2d 281, 289 n. 6 (8th Cir.1987); *see Racicky v. Farmland Indus., Inc.*, 328 F.3d 389, 400 (8th Cir. 2003) (quoting *American Road Equipment Co. v. Extrusions, Inc.*, 29 F.3d 341, 345 (8th Cir.1994), in turn quoting *Knickerbocker*).

In the Court's judgment the $165,000 emotional distress award in *Mathieu* and the $50,000 award in *Kucia* are useful case law "bookends" by which to gauge an appropriate remittitur amount in this case. As noted previously, Mathieu lost a job he had held thirty-four years. 273 F.3d at 783. Shepard was employed less than four years. Mathieu was also closer to retirement. This together with his disability made it unlikely he would ever achieve the same level of income and benefits he had enjoyed before. *Id.* at 779. Here the jury's award for future lost pay and benefits signals its belief that, though Shepard has had difficulty gaining employment to date, he should given his experience and education within the relatively near term be able to replace the income and benefits he lost. However, Mathieu like Shepard had been unable to mitigate damages, his standard of living had been reduced, and he was depressed. *Id.* at 779, 783.

Kucia, similar to Shepard, had not worked for her employer very long, about three years. 284 F.3d at 946. Like Shepard, her discharge had led to marital stress. *Id.* at 947. Unlike with Shepard, about a year after her termination Kucia was employed by another employer in the same daycare-type work, and later opened her own daycare business, though the business had not done very well. *Id.* Shepard's evidence of emotional distress also was, from what the Court can tell from the

*Kucia* opinion, stronger and more detailed than in that case. Kucia testified to some of the same feelings of a loss of self-esteem, but when asked whether she suffered any mental anguish replied "just personal insult, I guess." *Id.* In contrast, Shepard testified at length about the effect of the discharge on his self-esteem and self-confidence. Repeated denials of employment applications over a two-year period have taken an additional emotional toll. From the evidence in this case the jury could reasonably have found a significant, if not unusually severe emotional injury and compensated Shepard accordingly. This places the maximum amount of emotional distress damages proved by the evidence closer to the *Mathieu* end of the spectrum.

After careful consideration, the Court concludes that the maximum amount of damages for mental pain and suffering proved by the evidence is $130,000, $110,000 in past damages and $20,000 for future damages. In view of the passage of time and the jury's modest award for future lost wages and benefits, future damages for emotional distress cannot reasonably exceed $20,000.

### Instructions and Evidentiary Issues

The Court respectfully adheres to the rulings made on defendants' objections to the instructions and on the evidentiary issues addressed in the present motion for the reasons stated on the trial record. It is not necessary to discuss these issues at length.

Defendants first object to the Court's failure to instruct that if it found Shepard conducted an investigation or inquiry into Sam Craven's conduct, that activity was not speech protected by the First Amendment.[11] Defendants' proposal would have

---

11. The Court cannot find that defendants' written request for this instruction was ever filed. Fed.R.Civ.P. 51. The chambers copy

of defendants' proposed revisions to the Court's instructions contains the following requested instruction:

invited confusion and the Court continues to believe that viewed as a whole the Court's instructions adequately instructed the jury that the actionable conduct with respect to McKim on the First Amendment claim was Shepard's discharge for having made the protected statements to Sheriff Kirkendall regarding Craven's misconduct. *See* Inst. Nos. 7, 14, 15, 16, 18.

The Court excluded defendants' offer of portions of Brian Buza's deposition having to do with Shepard's loss of temper dealing with inmates, including a specific incident early in his tenure with the jail. There was plenty of evidence in the record about Shepard's penchant for being loud, demonstrative, and confrontational. The portions of the Buza deposition in question would have added little other than waste of time.

By pre-trial limine ruling evidence of Shepard's receipt of unemployment insurance benefits had been excluded. Defendants contended that Mrs. Shepard's testimony concerning the financial stress resulting from Shepard's discharge opened the door to evidence of unemployment compensation. The Court disagreed. Mrs. Shepard's testimony on the subject was general and the temporary receipt of unemployment benefits was of negligible impeachment value.

Two days after the meeting at which Shepard was fired Sheriff Kirkendall wrote a lengthy memorandum memorializing his version of what occurred at the meeting and the various complaints he had about Shepard's conduct. (Ex. D). The Court sustained plaintiff's hearsay objection to the exhibit and continues to believe that the ruling was correct. In any event, in his testimony Sheriff Kirkendall testified at length about the subjects addressed in the memorandum. The memorandum is not, as defendants now assert, probative of the Sheriff's state of mind at the time of the termination because it was written afterward in an effort to justify the action taken.

Finally, defendants do not make a convincing argument that a refusal to grant a new trial on the basis of any alleged trial error would be "inconsistent with substantial justice." Fed.R.Civ.P. 61. None of the alleged errors could have prejudicially influenced the outcome of the case, nor have defendants met their burden of showing such prejudice. *See Qualley v. Clo-Tex Intern. Inc.*, 212 F.3d 1123, 1128 (8th Cir.2000).

## IV.

## RULINGS AND ORDERS

In view of the foregoing, the following rulings and orders are entered:

1. Defendants' motion for judgment as a matter of law is denied;

2. Defendants' motion for new trial is granted in part and the judgment is conditionally vacated. New trial shall be had on plaintiff's damages provided, however, the motion for new trial will be denied if **on or before Tuesday, January 20, 2004,** plaintiff files a consent to remittitur of all damages for past mental or emotional pain and suffering in excess of $110,000, and all damages for future mental or emotional pain and suffering in excess of $20,000, in which event the unremitted portion of the judgment totaling $258,027 will stand plus interest as stated therein.

3. Past experience teaches it is appropriate to remind the parties that ordinarily

---

If you find that plaintiff conducted an investigation or inquiry into the alleged conduct of Sam Craven, such investigation or inquiry is not speech protected by the First Amendment, and, therefore, cannot be a basis for recovery, even if plaintiff eventually intended to speak out on such investigation or inquiry.

an order granting a new trial is not a final appealable ruling under the federal rules. *See Ortiz–Del Valle v. N.B.A.,* 190 F.3d 598, 599 (2d Cir.1999) (quoting *Herold v. Burlington Northern, Inc.,* 761 F.2d 1241, 1249 (8th Cir.1985) ("An order granting new trial after the refusal to accept a remittitur is an interlocutory order and not ordinarily appealable.")); *see also Littlewind v. Rayl,* 33 F.3d 985, 986 (8th Cir. 1994) (citing *Herold* ).

4. The Court will promptly determine the fee application as may be appropriate in light of plaintiff's decision with respect to the remittitur.

IT IS SO ORDERED.